# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

GOVERNMENT EMPLOYEES INSURANCE CO., GEICO INDEMNITY CO., GEICO GENERAL INSURANCE COMPANY and GEICO CASUALTY CO.,

      Plaintiffs,

**Case No.:**

vs.

AFO IMAGING, INC. d/b/a ADVANCED DIAGNOSTIC GROUP, RADIOLOGY IMAGING SPECIALISTS, LLC d/b/a CAREFIRST IMAGING, KEVIN JOHNSON, CHINTAN DESAI, M.D., ROBERT D. MARTINEZ, M.D., and STANLEY ZIMMELMAN, M.D.,

      Defendants.

_____ /

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs, Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. (collectively "GEICO" or "Plaintiffs"), as and for their Complaint against Defendants, hereby allege as follows:

1.    This action seeks to recover more than $23,000,000.00 that Defendants wrongfully obtained from GEICO by submitting, and causing to be submitted, thousands of fraudulent no-fault ("no-fault", "personal injury protection", or "PIP") insurance charges through Defendants AFO Imaging, Inc. d/b/a Advanced Diagnostic Group ("Advanced Diagnostic") and Radiology Imaging Specialists, LLC d/b/a CareFirst Imaging ("CareFirst")(collectively the "Radiology Clinics"), relating to medically unnecessary, illusory, unlawful, and otherwise non-reimbursable radiology services including magnetic resonance imaging ("MRIs")(collectively the "Fraudulent

Services"), that purportedly were provided to Florida automobile accident victims ("Insureds") who were eligible for coverage under GEICO no-fault insurance policies.

2.    In addition, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of pending, fraudulent no-fault insurance claims that the Defendants have submitted or caused to be submitted through the Radiology Clinics, because:

(i)    at all relevant times, the Radiology Clinics operated in violation of the licensing and operating requirements set forth in the Florida Health Care Clinic Act, Fla. Stat. § 400.990 et seq. (the "Clinic Act"), rendering them ineligible to collect no-fault insurance benefits in the first instance, and rendering their no-fault insurance charges noncompensable and unenforceable;

(ii)    the Fraudulent Services provided at the Radiology Clinics were not medically necessary, and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants and others, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; and

(iii)    in many cases, the Fraudulent Services never were provided in the first instance.

3.    The Defendants are as follows:

(i)    Defendant Advanced Diagnostic operated multiple diagnostic facilities throughout Florida through which the Fraudulent Services were purportedly performed and billed to insurance companies, including GEICO. Each facility operated by Advanced Diagnostic falsely purported to be a properly-licensed healthcare clinic that operated in compliance with the licensing and operating requirements set forth in the Clinic Act.

(ii)    Defendant CareFirst operated two diagnostic facilities in Florida where Fraudulent Services were purportedly performed and billed to insurance companies, including GEICO. Each facility operated by CareFirst falsely purported to be properly exempted from the licensing and operating requirements set forth in the Clinic Act.

(iii)    Defendant Kevin Johnson ("Johnson") owned and controlled Advanced Diagnostic and each of Advanced Diagnostic's facilities.

(iv)    Defendant Chintan Desai, M.D. ("Desai") is a physician licensed to practice medicine in Florida, owned and controlled CareFirst, falsely purported to legitimately interpret diagnostic images purportedly taken at the Radiology Clinics, and falsely purported to serve as the medical director of three Advanced Diagnostic healthcare clinics.

(v)    Defendant Robert D. Martinez, M.D. ("Martinez") is a physician licensed to practice medicine in Florida, and falsely purported to serve as the medical director of one Advanced Diagnostic healthcare clinic.

(vi)    Defendant Stanley Zimmelman, M.D. ("Zimmelman") is a physician licensed to practice medicine in Florida, and falsely purported to serve as the medical director of four Advanced Diagnostic healthcare clinics.

4.    As set forth below, Defendants at all relevant times have known that:

(i)    the Radiology Clinics operated in violation of the licensing and operating requirements set forth in the Clinic Act, rendering them ineligible to collect no-fault insurance in the first instance, and rendering their charges for no-fault insurance noncompensable and unenforceable;

(ii)    the Fraudulent Services at the Radiology Clinics were not medically necessary, and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants and others, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; and

(iii)    in many cases, the Fraudulent Services at the Radiology Clinics were never legitimately provided in the first instance.

5.    As such, the Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that were billed to GEICO through the Radiology Clinics.

6.    The charts annexed hereto as Exhibits "1" and "2" set forth a large and representative sample of the fraudulent claims that have been identified to-date that the Defendants have submitted, or caused to be submitted, to GEICO for the Fraudulent Services.

7.    The Defendants' interrelated fraudulent schemes began no later than 2015 and have continued uninterrupted since that time. As a result of Defendants' interrelated fraudulent schemes, GEICO has incurred damages of more than $23,000,000.00.

8.    The Defendants' fraudulent schemes are the latest in a long line of insurance fraud scams aimed at Florida consumers and insurers. They are part of an insurance fraud epidemic that – in 2014-2015 alone – led to almost 1,200 convictions in Florida. See Florida Department of Financial Services, Division of Insurance Fraud Annual Report for Fiscal Year 2014-2015.

## THE PARTIES

### I.   Plaintiffs

9.     Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. (collectively, "GEICO") are Maryland corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in Florida.

### II.   Defendants

10.     Defendant Advanced Diagnostic is a Florida corporation with a principal place of business in Tampa, Florida. Advanced Diagnostic was incorporated on or about July 28, 2003, was owned and controlled by Johnson, and was used as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers. At all relevant times, Advanced Diagnostic purported to own and operate multiple diagnostic facilities throughout Florida, and each facility falsely purported to be a properly-licensed healthcare clinic that operated in compliance with the licensing and operating requirements set forth in the Clinic Act. In particular, Advanced Diagnostic owned and operated the following healthcare clinics in violation of the Clinic Act:

(i)      Advanced Diagnostic Group, 607 W Dr. Martin Luther King Blvd, Suite 103, Tampa, Florida 33603 ("AD-Tampa 1")

(ii)     Advanced Diagnostic Group, 3104 W. Waters Ave., Tampa, Florida 33614 ("AD-Tampa 2")

(iii)    Advanced Diagnostic Group, 1111 Oakfield Drive, Brandon, Florida 33511 ("AD-Brandon")

(iv)    Advanced Diagnostic Group, 1121 Lakeland Hills Blvd., Lakeland, Florida 33805 ("AD-Lakeland")

(v)     Advanced Diagnostic Group, 56 West Oak Street, Kissimmee, Florida 34741 ("AD-Kissimmee")

(vi)    Advanced Diagnostic Group, 6388 Silver Star Road, Orlando, Florida 32818 ("AD-Orlando 1")

(vii)   Advanced Diagnostic Group, 775 N. Semoran Blvd., Orlando, Florida 32807 ("AD-Orlando 2")

(viii)  Advanced Diagnostic Group, 4215 Burns Road Suite 220, Palm Beach Gardens, Florida 33410 ("AD-Palm Beach Gardens")

(AD-Tampa 1, AD-Tampa 2, AD-Brandon, AD-Lakeland, AD-Kissimmee, AD-Orlando 1, AD-Orlando, and AD-Palm Beach Gardens are collectively referred to as the "Advanced Diagnostic Clinics")

11.     Defendant CareFirst is a Florida limited liability company with a principal place of business in Ocala, Florida. CareFirst was organized on or about March 23, 2016, was owned and controlled by Desai, had Desai as its sole member, and was used as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers. At all relevant times, CareFirst purported to own and operate two separate diagnostic facilities, which were located at 1714 SW 17th Street, Ocala, Florida 34471 and 616 N. Palmetto Street, Leesburg, Florida 34748. Each of these facilities falsely purported to be properly exempted from the licensing and operating requirements set forth in the Clinic Act.

12.     Defendant Johnson resides in and is a citizen of Florida. Johnson owned and controlled Advanced Diagnostic and each of the Advanced Diagnostic Clinics and used Advanced Diagnostic as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers.

13.     Defendant Martinez resides in and is a citizen of Florida. Martinez was licensed to practice medicine in Florida on March 10, 1997, and falsely purported to serve as the medical director at AD-Lakeland.

14.     Defendant Zimmelman resides in and is a citizen of Florida. Zimmelman was licensed to practice medicine in Florida on June 15, 1992, and falsely purported to serve as the medical director at AD-Tampa 2, AD-Palm Beach Gardens, AD-Kissimmee, and AD-Orlando 2.

15.     Defendant Desai resides in and is a citizen of Florida. Desai was licensed to practice

medicine in Florida on August 20, 2004. Desai falsely purported to serve as the medical director at AD-Tampa 1, AD-Brandon, and AD-Orlando 1, and purported to perform many of the Fraudulent Services that were billed through the Advanced Diagnostic Clinics to GEICO. Desai also owned and controlled CareFirst, falsely purported to supervise the business activities of CareFirst, purported to perform many of the Fraudulent Services that were billed through CareFirst to GEICO, and used CareFirst as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers.

16.     Desai has been involved in other alleged insurance fraud schemes that are similar to the interrelated fraudulent schemes set forth herein.

17.     For example, on December 17, 2013, Allstate Insurance Company ("Allstate") sued Desai and two diagnostic facilities where Desai worked – namely Horizon Imaging LLC ("Horizon Imaging") and Clear Imaging LLC ("Clear Imaging") – in the United States District Court for the Eastern District of Michigan in an action entitled <u>Allstate Insurance Company, et al. v. Universal Health Group, Inc., et al.</u>, Case No. 4:13-cv-15108-LVP-EAS (the "Allstate Action").

18.     In the Allstate Action, Allstate alleged – among other things – that Desai routinely misrepresented the findings contained in his radiology reports in an attempt to justify excessive and unnecessary treatment by the healthcare practitioners who referred patients to Horizon Imaging and Clear Imaging.

19.     The Allstate Action against Desai settled on undisclosed terms prior to discovery.

20.     After the conclusion of the Allstate Action, Desai was sued by State Farm Mutual Automobile Insurance Company ("State Farm") on August 22, 2016, in the United States District Court for the Eastern District of Michigan in an action entitled <u>State Farm Mutual Automobile Insurance Company v. Elite Health Centers, Inc., et al.</u>, Case No. 2:16-cv-13040-AC-APP (the

"State Farm Action").

21.     In the State Farm Action, State Farm alleged – among other things – that Desai reported substantially identical MRI findings for a large cohort of patients, to an extent that was not credible, and otherwise misrepresented the results of his MRIs.

22.     The State Farm Action against Desai settled on undisclosed terms prior to discovery.

23.     Upon information and belief, Desai's history of involvement in alleged insurance fraud schemes – which can be located by prospective employers and referral sources via simple internet searches – has made it difficult for Desai to obtain legitimate employment as a radiologist, and made him amenable to participation in the fraudulent schemes described herein.

## JURISDICTION AND VENUE

24.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the total matter in controversy, exclusive of interest and costs, exceeds the jurisdictional threshold of $75,000.00, and is between citizens of different states.

25.     This Court also has original jurisdiction pursuant to 28 U.S.C. § 1331 over claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act).

26.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

27.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Middle District of Florida is the District where one or more of Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS

### I.     An Overview of the Pertinent Law Governing No-Fault Insurance Reimbursement

#### A.     The Florida No-Fault Law

28.     Florida has a comprehensive statutory system designed to ensure that motor vehicle accident victims are compensated for their injuries. The statutory system is embodied within the Florida Motor Vehicle No-Fault Law (the "No-Fault Law", Fla. Stat. §§ 627.730-627.7405), which requires automobile insurers to provide Personal Injury Protection benefits ("PIP Benefits") to Insureds.

29.     Under the No-Fault Law, an Insured can assign his or her right to PIP Benefits to healthcare services providers in exchange for those services. See Fla. Stat. § 627.736. Pursuant to a duly executed assignment, a healthcare services provider may submit claims directly to an insurance company in order to receive payment for medically necessary services, using the required claim forms, including the Healthcare Financing Administration insurance claim form (known as the "HCFA-1500 form" or "CMS-1500" form). See id.

30.     All HCFA-1500 forms submitted by a healthcare provider to an insurer, such as GEICO, must be verified by the healthcare provider subject to the following warning:

> Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.

#### B.     No-Fault Reimbursement and Compliance with Florida Law Governing Healthcare Practice

31.     In order for a healthcare service to be eligible for PIP reimbursement, it must be "lawfully" provided. See Fla. Stat. § 627.736.

8

32.     Pursuant to the No-Fault Law, "lawful" or "lawfully" means "in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of state and federal law related to the provision of medical services or treatment." See Fla. Stat. § 627.732.

33.     Thus, healthcare services providers, including clinics licensed under the Clinic Act, may not recover PIP Benefits for healthcare services that were not provided in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of Florida and federal law related to the provision of the underlying services or treatment – including, among other things, the licensing and operating requirements set forth in the Clinic Act.

34.     By extension, insurers such as GEICO are not required to make any payments of PIP Benefits for healthcare services that were not provided in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of Florida and federal law related to the provision of the underlying services or treatment.

## C.     No-Fault Reimbursement and the Clinic Act

35.     Subject to certain limited exceptions, a license issued by the Florida Agency for Health Care Administration is required in order to operate a clinic in Florida. See Fla. Stat. § 400.991(1)(a). The Clinic Act defines "clinic" to mean "an entity where health care services are provided to individuals and which tenders charges for reimbursement for such services, including a mobile clinic and a portable equipment provider." See Fla. Stat. § 400.9905.

36.     However, the Clinic Act provides an exemption from the clinic licensing requirements for:

> A sole proprietorship, group practice, partnership, or corporation that provides health care services by licensed health care practitioners . . . that is wholly owned by one or more licensed health care practitioners, or the licensed health care practitioners set forth in this paragraph and the spouse, parent, child, or sibling of a licensed health care practitioner if one of the owners who is a licensed health care practitioner is supervising the business

9

<u>activities and is legally responsible for the entity's compliance with all federal and state laws. …</u>

Fla. Stat. § 400.9905(4)(g)(emphasis added).

37.     In order to qualify for the "wholly owned" exemption under the Clinic Act, "the licensed health care practitioner has a continuing obligation to supervise the business activities of the clinic and remain legally responsible for the entity's compliance with all federal and state laws.

38.     A clinic that does not qualify for the wholly owned exemption, and does not otherwise have a clinic license, operates unlawfully under Florida law.

39.     Pursuant to the Clinic Act, clinics operating in Florida that do not qualify for the "wholly owned" exemption must – among other things – "appoint a medical director or clinic director who shall agree in writing to accept legal responsibility for [certain enumerated] activities on behalf of the clinic." <u>See</u> Fla. Stat. § 400.9935(1).

40.     Among other things, a clinic medical director must "[c]onduct systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful. Upon discovery of an unlawful charge, the medical director or clinic director shall take immediate corrective action." <u>See</u> Fla. Stat. § 400.9935(1).

41.     Pursuant to the Clinic Act, "[a] charge or reimbursement claim made by or on behalf of a clinic that is required to be licensed under this part but that is not so licensed, or that is otherwise operating in violation of this part, regardless of whether a service is rendered or whether the charge or reimbursement claim is paid, is an unlawful charge and is noncompensable and unenforceable. A person who knowingly makes or causes to be made an unlawful charge commits theft within the meaning of, and punishable as provided in, [Fla. Stat. §] 812.014." <u>See</u> Fla. Stat. § 400.9935(3).

42.     Thus, pursuant to both the No-Fault Law and the Clinic Act, clinics that operate in violation of the Clinic Act's medical director or other operating requirements are not entitled to collect PIP Benefits, whether or not the underlying health care services were medically necessary or actually provided.

43.     By extension, insurers such as GEICO are not required to make any payments of PIP Benefits to clinics that operate in violation of the Clinic Act's medical director or other requirements, whether or not the underlying health care services were medically necessary or actually provided.

**D.     No-Fault Reimbursement and Medical Necessity**

44.     Pursuant to the No-Fault Law, insurers such as GEICO are only required to pay PIP Benefits for medically necessary services. See Fla. Stat. § 627.736. Concomitantly, a healthcare services provider, including a clinic organized under the Clinic Act, is only eligible to receive PIP Benefits for medically necessary services. Id.

45.     Pursuant to the No-Fault Law, "medically necessary" means:

a medical service or supply that a prudent physician would provide for the purpose of preventing, diagnosing, or treating an illness, injury, disease, or symptom in a manner that is:

(a) In accordance with generally accepted standards of medical practice;

(b) Clinically appropriate in terms of type, frequency, extent, site, and duration; and

(c) Not primarily for the convenience of the patient, physician, or other healthcare provider.

See Fla. Stat. § 627.732.

E.    **No-Fault Billing and No-Fault Reimbursement**

46.    Pursuant to the No-Fault Law, insurers such as GEICO are not required to pay PIP

Benefits:

(i)    For any service or treatment that was not lawful at the time rendered;

(ii)    To any person who knowingly submits a false or misleading statement relating to the claim or charges; or

(iii)    With respect to a bill or statement that does not substantially meet the billing requirements set forth in the No-Fault Law.

See Fla. Stat. § 627.736.

47.    The No-Fault Law's billing requirements provide – among other things – that all

PIP billing must, to the extent applicable, comply with the instructions promulgated by the Centers

for Medicare & Medicaid Services for the completion of HCFA-1500 forms, as well as the

guidelines promulgated by the American Medical Association ("AMA") in connection with the

use of current procedural terminology ("CPT") codes. See Fla. Stat. § 627.736.

II.    **Defendants' Fraudulent Schemes**

48.    Since at least 2015, and continuing through the present day, the Defendants

masterminded and implemented a series of interrelated fraudulent schemes in which they billed

GEICO, or caused GEICO to be billed, tens of millions of dollars for medically unnecessary,

illusory, and otherwise non-reimbursable Fraudulent Services.

A.    **The Medically Unnecessary MRIs**

49.    The Defendants' ability to bill GEICO and other Florida automobile insurers for

the Fraudulent Services depended upon their ability to gain access to Insureds.

50.    However, in the claims identified in Exhibits "1" and "2", the substantial majority

of the Insureds had been involved in relatively minor, low-speed, low-impact "fender-bender"

accidents, to the extent that they were involved in any actual accidents at all.

51.     In keeping with the fact that the Insureds within the claims identified in Exhibits "1" and "2" typically were involved in only minor accidents, in many of the claims identified in Exhibits "1" and "2" the Insureds did not seek treatment at any hospital after their minor accidents.

52.     To the extent that the Insureds in the claims identified in Exhibits "1" and "2" did seek treatment at a hospital as a result of their accidents, they virtually always were briefly observed on an outpatient basis and then sent on their way the same day with, at most, a minor sprain, strain, or similar soft tissue injury diagnosis.

53.     Furthermore, contemporaneous police reports typically indicated that the underlying accidents involved low-speed, low-impact collisions, that the Insureds' vehicles were drivable following the accidents, and that no one was seriously injured in the underlying accidents.

54.     To the extent that the Insureds in the claims identified in Exhibits "1" and "2" had any injuries at all as the result of an automobile accident, the injuries virtually always were garden-variety, minor soft tissue injuries such as sprains and strains.

55.     In a legitimate clinical setting, MRIs should not be used as an initial form of diagnostic testing in the treatment of patients complaining of soft tissue injuries such as sprains or strains secondary to automobile accidents.

56.     For example, the American College of Radiology – an almost 100 year-old professional organization with a mission to serve patients and society by empowering members to advance the practice, science and professions of radiological care – has indicated that MRIs usually are not appropriate as a first-line diagnostic tool in the treatment of patients complaining of soft tissue injuries secondary to automobile accidents.

57.     Along similar lines, the American College of Physicians – a more than 100 year-

old professional organization with a mission to enhance the quality and effectiveness of health care by fostering excellence and professionalism in the practice of medicine – likewise has indicated that MRIs usually are not appropriate as a first-line diagnostic tool in the treatment of patients complaining of soft tissue injuries secondary to automobile accidents.

58.     Moreover, there are many radiology practices in Florida that are available to provide radiology services – including MRIs – to automobile accident victims.

59.     Upon information and belief, the lack of medical necessity for the Defendants' Fraudulent Services, the plethora of similar radiology practices in the market, and Desai's history of alleged involvement in automobile insurance fraud schemes – which could be identified by potential referral sources via a simple internet search – made it difficult for the Radiology Clinics to obtain legitimate referrals from legitimate referral sources.

60.     However, the Defendants knew that there are chiropractors and other healthcare providers in Florida that: (i) purport to provide treatment to patients who are pursuing personal injury lawsuits based on automobile accidents; and (ii) are in a position to make a substantial number of radiology referrals.

61.     These healthcare providers often have an incentive to make it appear as if their patients are seriously injured, when in fact they are not, in order to support the patients' personal injury claims, and to create a false justification for the healthcare providers to bill for extensive, medically unnecessary "treatment".

62.     Accordingly, in order to generate a steady stream of referrals to the Radiology Clinics for medically unnecessary MRIs, the Defendants – as set forth herein – provided medically unnecessary MRIs to Insureds, and misrepresented the nature, extent, and legitimacy of the MRIs, as well as the results of the MRIs, so as to make it appear as if the Insureds had suffered serious

injuries as the result of their typically-minor automobile accidents, when in fact they had not.

63.     For example, the Defendants routinely purported to provide MRIs to Insureds who did not require them.

64.     As set forth above, MRIs should not be used as an initial form of diagnostic testing in the treatment of patients complaining of soft tissue injuries such as sprains and strains secondary to automobile accidents.

65.     In fact, in a legitimate clinical setting, patients suffering from soft tissue injuries such as strains or sprains secondary to automobile accidents generally should not receive MRIs until they receive at least four to eight weeks of conservative treatment.

66.     This is because the substantial majority of soft tissue injuries such as sprains and strains will resolve over a period of weeks through conservative treatment, or no treatment at all, and unnecessary diagnostic imaging can be counterproductive and can even be harmful to the patient.

67.     Even so, in order to generate a steady stream of referrals to the Radiology Clinics for medically unnecessary MRIs, the Defendants routinely purported to perform and/or provide medically unnecessary MRIs to Insureds as an initial form of diagnostic testing, soon after the Insureds' underlying automobile accidents. This, despite the fact that the Insureds had not suffered any injuries that would warrant MRIs, and – in any case – had not, and could not have, legitimately tried and failed a course of conservative treatment at the time when the MRIs purportedly were provided.

68.     For example:

(i)     On May 26, 2016, an Insured named JS was involved in a minor automobile accident. In keeping with the fact that the accident was minor, JS did not seek treatment at any hospital after the accident. To the extent that JS experienced any health issues at all as the result of the accident, they were minor soft tissue injuries

that did not require MRIs, especially before the Insured had failed a course of conservative treatment. Even so, Advanced Diagnostic, Johnson, Zimmelman, and Desai purported to provide, and billed GEICO for: (i) a medically unnecessary MRI of JS's lumbar spine; and (ii) a medically unnecessary MRI of JS's cervical spine on June 8, 2016 at AD-Orlando 2, which was before JS had a chance to complete any legitimate course of conservative treatment.

(ii)     On June 28, 2016, an Insured named SS was involved in an automobile accident. In keeping with the fact that the accident was minor SS did not seek treatment at any hospital after the accident. To the extent that SS experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before the Insured had failed a course of conservative treatment. Even so, Advanced Diagnostic, Johnson, Zimmelman, and Desai purported to provide, and billed GEICO for, among other things, a medically unnecessary MRI of SS's lumbar spine and cervical spine on July 15, 2016 at AD-Palm Beach Gardens, which was before SS had a chance to complete any legitimate course of conservative treatment.

(iii)    On August 10, 2016, an Insured named NF was involved in a minor automobile accident. In keeping with the fact that the accident was minor, NF did not seek treatment at any hospital after the accident. Instead, NF first sought treatment at a local medical office almost two weeks after the accident. To the extent that NF experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before the Insured had failed a course of conservative treatment. Even so, Advanced Diagnostic, Johnson, Zimmelman, and Desai purported to provide, and billed GEICO for: (i) a medically unnecessary MRI of NF's lumbar spine; and (ii) a medically unnecessary MRI of NF's cervical spine on September 19, 2016 at AD-Orlando 2, which was before NF had a chance to complete any legitimate course of conservative treatment.

(iv)     On October 20, 2016, an Insured named LB was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that LB's vehicle was drivable following the accident, and that LB refused medical attention at the scene. In keeping with the fact that LB was not seriously injured, LB did not visit any hospital emergency room following the accident. To the extent that LB experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before the Insured had failed a course of conservative treatment. Even so, Advanced Diagnostic, Johnson, and Desai purported to provide, and billed GEICO for: (i) a medically unnecessary MRI of LB's cervical spine; (ii) a medically unnecessary MRI of LB's lumbar spine; and (iii) a medically unnecessary MRI of LB's thoracic spine on November 11, 2016 at AD-Tampa 1, which was before LB had a chance to complete any legitimate course of conservative treatment.

(v)      On December 1, 2016, an Insured named TH was involved in a minor automobile accident. In keeping with the fact that the accident was minor, TH was not seriously

injured and did not visit any hospital emergency room after accident. To the extent that TH experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before the Insured had failed a course of conservative treatment. Even so, CareFirst and Desai purported to provide, and billed GEICO for: (i) a medically unnecessary MRI of TH's cervical spine; and (ii) a medically unnecessary MRI of TH's lumbar spine on December 23, 2016, which was before TH had a chance to complete any legitimate course of conservative treatment.

(vi)     On December 18, 2016, an Insured named RO was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that RO was not treated for any medical condition at the scene or transported to a hospital as a result of the accident. In keeping with the fact that RO was not seriously injured, RO took himself to the hospital emergency room and was discharged hours after arriving without being admitted to the hospital. To the extent that RO experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before the Insured had failed a course of conservative treatment. Even so, Advanced Diagnostic, Johnson, and Desai purported to provide, and billed GEICO for a medically unnecessary MRI of RO's cervical spine on December 20, 2016 at AD-Orlando 1, which was before RO had a chance to complete any legitimate course of conservative treatment.

(vii)    On March 24, 2017, an Insured named ED was involved in a minor automobile accident. In keeping with the fact that the accident was minor, ED was not seriously injured and was discharged from the hospital emergency room hours after arriving without being admitted to the hospital. To the extent that ED experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before the Insured had failed a course of conservative treatment. Even so, CareFirst and Desai purported to provide, and billed GEICO for: (i) a medically unnecessary MRI of ED's cervical spine; and (ii) a medically unnecessary MRI of ED's lumbar spine on March 31, 2017, which was before ED had a chance to complete any legitimate course of conservative treatment.

(viii)   On March 24, 2017, an Insured named KD was involved in a minor automobile accident. In keeping with the fact that the accident was minor, KD was not seriously injured and was discharged from the hospital emergency room hours after arriving without being admitted to the hospital. To the extent that KD experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before the Insured had failed a course of conservative treatment. Even so, CareFirst and Desai purported to provide, and billed GEICO for: (i) a medically unnecessary MRI of KD's cervical spine; and (ii) a medically unnecessary MRI of KD's lumbar spine on March 31, 2017, which was before KD had a chance to complete any legitimate course of conservative treatment.

(ix)    On April 3, 2017, an Insured named AS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that AS's vehicle was drivable following the accident, and that AS was not injured at the scene. To the extent that AS experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before the Insured had failed a course of conservative treatment. Even so, Advanced Diagnostic, Johnson, Zimmelman, and Desai purported to provide, and billed GEICO for, among other things, a medically unnecessary MRI of AS's lumbar spine and on May 11, 2017 at AD-Palm Beach Gardens, which was before AS had a chance to complete any legitimate course of conservative treatment.

(x)    On April 8, 2017, an Insured named VS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that VS's vehicle was drivable following the accident, and that VS did not obtain any medical treatment at the scene. In keeping with the fact that VS was not seriously injured, VS did not visit any hospital emergency room following the accident. To the extent that VS experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before the Insured had failed a course of conservative treatment. Even so, Advanced Diagnostic, Johnson, and Desai purported to provide, and billed GEICO for: (i) a medically unnecessary MRI of VS's cervical spine; and (ii) a medically unnecessary MRI of VS's lumbar spine on April 28, 2017 at AD-Orlando 1, which was before VS had a chance to complete any legitimate course of conservative treatment.

(xi)    On April 13, 2017, an Insured named JR was involved in a minor automobile accident. In keeping with the fact that the accident was minor, JR was not seriously injured and was discharged from the hospital emergency room hours after arriving without being admitted to the hospital. To the extent that JR experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before the Insured had failed a course of conservative treatment. Even so, CareFirst and Desai purported to provide, and billed GEICO for: (i) a medically unnecessary MRI of JR's cervical spine; and (ii) a medically unnecessary MRI of JR's lumbar spine on May 8, 2017, which was before JR had a chance to complete any legitimate course of conservative treatment.

(xii)    On April 24, 2017, an Insured named PC was involved in a minor automobile accident. In keeping with the fact that the accident was minor, PC was not seriously injured and did not visit any hospital emergency room immediately after the accident. To the extent that PC experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before the Insured had failed a course of conservative treatment. Even so, CareFirst and Desai purported to provide, and billed GEICO for: (i) a medically unnecessary MRI of PC's cervical spine; and (ii) a medically unnecessary MRI of PC's lumbar spine on May 12, 2017, which was before PC had a chance to complete any legitimate course of conservative treatment.

(xiii)   On May 3, 2017, an Insured named ER was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that ER's vehicle was drivable following the accident, and that ER was not insured as a result of the accident. In keeping with the fact that ER was not seriously injured, ER did not visit any hospital emergency room following the accident. To the extent that ER experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before the Insured had failed a course of conservative treatment. Even so, Advanced Diagnostic, Johnson, Zimmelman, and Desai purported to provide, and billed GEICO for a medically unnecessary MRI of ER's lumbar spine on May 16, 2017 at AD-Kissimmee, which was before ER had a chance to complete any legitimate course of conservative treatment.

(xiv)   On May 28, 2017, an Insured named MR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a front end collision, and that MR did not complain of any pain at the scene and was not treated by emergency medical personnel. In keeping with the fact that MR was not seriously injured, MR took herself to a hospital emergency room following the accident and was discharged hours after arriving without being admitted to the hospital. To the extent that MR experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before the Insured had failed a course of conservative treatment. Even so, Advanced Diagnostic, Johnson, and Desai purported to provide, and billed GEICO for: (i) a medically unnecessary MRI of MR's cervical spine; and (ii) a medically unnecessary MRI of MR's lumbar spine on June 14, 2017 at AD-Orlando 1, which was before MR had a chance to complete any legitimate course of conservative treatment.

(xv)   On June 28, 2017, an Insured named JK was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that JK's vehicle as drivable following the accident, and that JK was not transported to a hospital. In keeping with the fact that JK was not seriously injured, JK did not visit any hospital emergency room following the accident. To the extent that JK experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before the Insured had failed a course of conservative treatment. Even so, Advanced Diagnostic, Johnson, Zimmelman, and Desai purported to provide, and billed GEICO for medically unnecessary MRIs of JK's lumbar spine and cervical spine on the same date as the accident at AD-Kissimmee, which was before JK had a chance to complete any course of conservative treatment.

(xvi)   On October 8, 2017, an Insured named OP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that OP's vehicle was drivable following the accident, and that OP did not complain of any pain at the scene. In keeping with the fact that OP was not seriously injured, OP did not visit any hospital emergency room following the accident. To the extent that OP experienced any health issues at all as the result

of the accident, they were minor soft tissue injuries that did not require MRIs, especially before the Insured had failed a course of conservative treatment. Even so, Advanced Diagnostic, Johnson, and Desai purported to provide, and billed GEICO for: (i) a medically unnecessary MRI of OP's cervical spine; (ii) a medically unnecessary MRI of OP's lumbar spine; and (iii) a medically unnecessary MRI of OP's extremity on October 31, 2017 at AD-Orlando 1, which was before OP had a chance to complete any legitimate course of conservative treatment.

(xvii)   On November 25, 2017, an Insured named DD was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that DD's vehicle was drivable following the accident, and that DD did not complain of any pain at the scene. In keeping with the fact that DD was not seriously injured, DD did not visit any hospital emergency room following the accident. To the extent that DD experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before the Insured had failed a course of conservative treatment. Even so, Advanced Diagnostic, Johnson, and Desai purported to provide, and billed GEICO for a medically unnecessary MRI of DD's cervical spine on December 5, 2017 at AD-Tampa 1, which was before DD had a chance to complete any legitimate course of conservative treatment.

(xviii)  On December 4, 2017, an Insured named AD was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear end collision, and that AD's airbags were not deployed. In keeping with the fact that AD was not seriously injured, AD visited the emergency room following the accident and was discharged hours after arriving without being admitted to the hospital. To the extent that AD experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before the Insured had failed a course of conservative treatment. Even so, Advanced Diagnostic, Johnson, and Desai purported to provide, and billed GEICO for: (i) a medically unnecessary MRI of AD's cervical spine; and (ii) a medically unnecessary MRI of AD's lumbar spine on January 8, 2018 at AD-Tampa 1, which was before AD had a chance to complete any legitimate course of conservative treatment.

(xix)    On January 19, 2018, an Insured named AT was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that AT's airbag was not deployed as a result of the accident, and that AT did not complain of any pain at the scene. In keeping with the fact that AT was not seriously injured, AT did not visit any hospital emergency room following the accident. To the extent that AT experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before the Insured had failed a course of conservative treatment. Even so, Advanced Diagnostic, Johnson, and Desai purported to provide, and billed GEICO for, among other things: (i) a medically unnecessary MRI of AT's cervical spine; and (ii) a medically unnecessary MRI of AT's lumbar spine

on February 27, 2018 at AD-Tampa 1, which was before AT had a chance to complete any legitimate course of conservative treatment.

(xx)     On March 15, 2018, an Insured named BM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that BM's vehicle was drivable following the accident, and that BM did not complain of any pain at the scene. In keeping with the fact that BM was not seriously injured, BM did not visit any hospital emergency room following the accident. To the extent that BM experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before the Insured had failed a course of conservative treatment. Even so, Advanced Diagnostic, Johnson, and Desai purported to provide, and billed GEICO for, among other things, a medically unnecessary MRI of BM's lumbar spine on April 6, 2018 at AD-Tampa 1, which was before BM had a chance to complete any legitimate course of conservative treatment.

(xxi)    On March 31, 2018, an Insured named MB was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that MB suffered non-life threatening injuries. In keeping with the fact that MB was not seriously injured, MB only complained of low to moderate level pain. To the extent that MB experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before the Insured had failed a course of conservative treatment. Even so, Advanced Diagnostic, Johnson, and Desai purported to provide, and billed GEICO for: (i) a medically unnecessary MRI of MB's cervical spine; (ii) a medically unnecessary MRI of MB's lumbar spine; and (iii) a medically unnecessary MRI of MB's brain on April 10, 2018 at AD-Tampa 1, which was before MB had a chance to complete any legitimate course of conservative treatment.

(xxii)   On April 4, 2018, an Insured named IW was involved in a minor automobile accident. In keeping with the fact that the accident was minor, IW was not seriously injured and was discharged from the hospital emergency room hours after arriving without being admitted to the hospital. To the extent that IW experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before the Insured had failed a course of conservative treatment. Even so, CareFirst and Desai purported to provide, and billed GEICO for: (i) a medically unnecessary MRI of IW's cervical spine; and (ii) a medically unnecessary MRI of IW's lumbar spine on April 12, 2018, which was before IW had a chance to complete any legitimate course of conservative treatment.

(xxiii)  On May 11, 2018, an Insured named KJ was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that the airbags in KJ's vehicle did not deploy. In keeping with the fact that KJ was not seriously injured, KJ visited the emergency room following the accident and was discharged hours after arriving without being

admitted to the hospital. To the extent that KJ experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before the Insured had failed a course of conservative treatment. Even so, Advanced Diagnostic, Johnson, and Desai purported to provide, and billed GEICO for: (i) a medically unnecessary MRI of KJ's cervical spine; and (ii) a medically unnecessary MRI of KJ's lumbar spine on June 5, 2018 at AD-Brandon, which was before KJ had a chance to complete any legitimate course of conservative treatment.

(xxiv)  On June 4, 2018, an Insured named EA was involved in a minor automobile accident. In keeping with the fact that the accident was minor, EA was not seriously injured and did not seek treatment at a hospital emergency room after the accident. To the extent that EA experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before the Insured had failed a course of conservative treatment. Even so, CareFirst and Desai purported to provide, and billed GEICO for: (i) a medically unnecessary MRI of EA's cervical spine; and (ii) a medically unnecessary MRI of EA's lumbar spine on June 11, 2018, which was before EA had a chance to complete any legitimate course of conservative treatment.

(xxv)   On June 4, 2018, an Insured named EB was involved in a minor automobile accident. In keeping with the fact that the accident was minor, EB was not seriously injured and did not seek treatment at a hospital emergency room after the accident. To the extent that EB experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before the Insured had failed a course of conservative treatment. Even so, CareFirst and Desai purported to provide, and billed GEICO for: (i) a medically unnecessary MRI of EB's cervical spine; and (ii) a medically unnecessary MRI of EB's lumbar spine on June 11, 2018, which was before EB had a chance to complete any legitimate course of conservative treatment.

(xxvi)  On June 17, 2018, an Insured named JD was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision. In keeping with the fact that JD was not seriously injured, JD visited the emergency room following the accident and was discharged hours after arriving without being admitted to the hospital. To the extent that JD experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before the Insured had failed a course of conservative treatment. Even so, Advanced Diagnostic, Johnson, and Desai purported to provide, and billed GEICO for: (i) a medically unnecessary MRI of JD's cervical spine; (ii) a medically unnecessary MRI of JD's lumbar spine; and (iii) a medically unnecessary MRI of JD's thoracic spine on July 7, 2018 at AD-Tampa 1, which was before JD had a chance to complete any legitimate course of conservative treatment.

(xxvii) On June 27, 2018, an Insured named OS was involved in a minor automobile accident. In keeping with the fact that the accident was minor, OS was not seriously

injured and was not transported to a hospital emergency room following the accident. To the extent that OS experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before the Insured had failed a course of conservative treatment. Even so, CareFirst and Desai purported to provide, and billed GEICO for: (i) a medically unnecessary MRI of OS's cervical spine; and (ii) a medically unnecessary MRI of OS's lumbar spine on July 24, 2018, which was before OS had a chance to complete any legitimate course of conservative treatment.

(xxviii) On July 10, 2018, an Insured named JG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that JG's vehicle was drivable following the accident, and that JG refused medical attention at the scene. In keeping with the fact that JG was not seriously injured, JG did not visit any hospital emergency room following the accident. To the extent that JG experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before the Insured had failed a course of conservative treatment. Even so, Advanced Diagnostic, Johnson, Zimmelman, and Desai purported to provide, and billed GEICO for: (i) a medically unnecessary MRI of JG's cervical spine; and (ii) a medically unnecessary MRI of JG's lumbar spine on July 14 and July 18, 2018 at AD-Tampa 2, which was before JG had a chance to complete any legitimate course of conservative treatment.

(xxix) On July 13, 2018, an Insured named AA was involved in a minor automobile accident. In keeping with the fact that the accident was minor, AA was not seriously injured and did not seek treatment at a hospital emergency room after the accident. To the extent that AA experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before the Insured had failed a course of conservative treatment. Even so, CareFirst and Desai purported to provide, and billed GEICO for: (i) a medically unnecessary MRI of AA's cervical spine; and (ii) a medically unnecessary MRI of AA's lumbar spine on July 21, 2018, which was before AA had a chance to complete any legitimate course of conservative treatment.

(xxx) On July 13, 2018, an Insured named NR was involved in a minor automobile accident. In keeping with the fact that the accident was minor, NR was not seriously injured and was discharged from the hospital emergency room hours after arriving without being admitted to the hospital. To the extent that NR experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before the Insured had failed a course of conservative treatment. Even so, CareFirst and Desai purported to provide, and billed GEICO for: (i) a medically unnecessary MRI of NR's cervical spine; and (ii) a medically unnecessary MRI of NR's lumbar spine on July 21, 2018, which was before NR had a chance to complete any legitimate course of conservative treatment.

(xxxi)  On July 19, 2018, an Insured named KM was involved in a minor automobile accident. In keeping with the fact that the accident was minor, KM was not seriously injured and was discharged from the hospital emergency room hours after arriving without being admitted to the hospital. To the extent that KM experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before the Insured had failed a course of conservative treatment. Even so, Advanced Diagnostic, Johnson, Martinez, and Desai purported to provide, and billed GEICO for: (i) a medically unnecessary MRI of KM's cervical spine; and (ii) a medically unnecessary MRI of KM's lumbar spine on July 31, 2018 at AD-Lakeland, which was before KM had a chance to complete any legitimate course of conservative treatment.

(xxxii)  On July 25, 2018, an Insured named VP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that VP's vehicle was drivable following the accident, and that VP did not complain of any pain at the scene. In keeping with the fact that VP was not seriously injured, VP did not visit any hospital emergency room following the accident. To the extent that VP experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before the Insured had failed a course of conservative treatment. Even so, Advanced Diagnostic, Johnson, and Desai purported to provide, and billed GEICO for a medically unnecessary MRI of VP's cervical spine on August 15, 2018 at AD-Brandon, which was before VP had a chance to complete any legitimate course of conservative treatment

(xxxiii)  On October 12, 2018, an Insured named AF was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that AF's vehicle was drivable following the accident, and that AF did not complain of any pain at the scene. In keeping with the fact that AF was not seriously injured, AF did not visit any hospital emergency room following the accident. To the extent that AF experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before the Insured had failed a course of conservative treatment. Even so, Advanced Diagnostic, Johnson, Zimmelman, and Desai purported to provide, and billed GEICO for, among other things: (i) a medically unnecessary MRI of AF's cervical spine; and (ii) a medically unnecessary MRI of AF's lumbar spine on October 24, 2018 at AD-Tampa 2, which was before AF had a chance to complete any legitimate course of conservative treatment.

(xxxiv)  On October 14, 2018, an Insured named DP was involved in a minor automobile accident. In keeping with the fact that the accident was minor, DP was not seriously injured and was discharged from the hospital emergency room hours after arriving without being admitted to the hospital. To the extent that DP experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before the Insured had failed a course of conservative treatment. Even so, CareFirst and Desai purported to provide, and billed GEICO for: (i) a medically unnecessary MRI of DP's cervical spine; and (ii)

a medically unnecessary MRI of DP's lumbar spine on October 20, 2018, which was before DP had a chance to complete any legitimate course of conservative treatment.

(xxxv)  On December 26, 2018, an Insured named AN was involved in a minor automobile accident. In keeping with the fact that the accident was minor, AN was not seriously injured and was discharged from the hospital emergency room hours after arriving without being admitted to the hospital. To the extent that AN experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before the Insured had failed a course of conservative treatment. Even so, CareFirst and Desai purported to provide, and billed GEICO for: (i) a medically unnecessary MRI of AN's cervical spine; and (ii) a medically unnecessary MRI of AN's lumbar spine on January 12, 2019, which was before AN had a chance to complete any legitimate course of conservative treatment.

(xxxvi) On May 26, 2019, an Insured named AM was involved in a minor automobile accident. In keeping with the fact that the accident was minor, AM did not complain of any injuries at the scene and did not seek treatment at any hospital after the accident. To the extent that AM experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before the Insured had failed a course of conservative treatment. Even so, Advanced Diagnostic, Johnson, Zimmelman, and Desai purported to provide, and billed GEICO for a medically unnecessary MRI of AM's lumbar on June 8, 2019 at AD-Kissimmee, which was before AM had a chance to complete any legitimate course of conservative treatment.

(xxxvii)   On June 16, 2019, an Insured named DC was involved in a minor automobile accident. In keeping with the fact that the accident was minor, DC was not seriously injured and was not transported to a hospital emergency room after the accident. To the extent that DC experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before the Insured had failed a course of conservative treatment. Even so, Advanced Diagnostic, Johnson, Martinez, and Desai purported to provide, and billed GEICO for: (i) a medically unnecessary MRI of DC's cervical spine; and (ii) a medically unnecessary MRI of DC's lumbar spine on June 24, 2019 at AD-Lakeland, which was before DC had a chance to complete any legitimate course of conservative treatment.

(xxxviii)   On June 16, 2019, an Insured named KC was involved in a minor automobile accident. In keeping with the fact that the accident was minor, KC was not seriously injured and was not transported to a hospital emergency room after the accident. To the extent that KC experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before the Insured had failed a course of conservative treatment. Even so, Advanced Diagnostic, Johnson, Martinez, and Desai purported to provide, and billed GEICO for: (i) a medically unnecessary MRI of KC's cervical spine; and (ii)

a medically unnecessary MRI of KC's lumbar spine on July 1, 2019 at AD-Lakeland, which was before KC had a chance to complete any legitimate course of conservative treatment.

(xxxix) On December 4, 2019, an Insured named DL was involved in a minor automobile accident. In keeping with the fact that the accident was minor, DL was not seriously injured and did not visit any hospital emergency room after accident. To the extent that DL experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before the Insured had failed a course of conservative treatment. Even so, CareFirst and Desai purported to provide, and billed GEICO for: (i) a medically unnecessary MRI of DL's cervical spine on December 16, 2019; and (ii) a medically unnecessary MRI of DL's lumbar spine December 23, 2019, which was before DL had a chance to complete any legitimate course of conservative treatment.

(xl) On January 18, 2020, an Insured named LV was involved in a minor automobile accident. In keeping with the fact that the accident was minor, LV was not seriously injured and was not transported to a hospital emergency room after the accident. LV drove himself to the hospital emergency room and was discharged hours after arriving without being admitted to the hospital with a diagnosis of minor soft tissue injuries that did not require MRIs, especially before the Insured had failed a course of conservative treatment. Even so, CareFirst and Desai purported to provide, and billed GEICO for: (i) a medically unnecessary MRI of LV's cervical spine; and (ii) a medically unnecessary MRI of LV's lumbar spine on February 1, 2020, which was before LV had a chance to complete any legitimate course of conservative treatment.

69. These are only representative examples. In the claims identified in Exhibits "1" and "2", the Defendants routinely purported to perform and/or provide medically unnecessary MRIs to Insureds as an initial form of diagnostic testing soon after the Insureds' underlying automobile accidents, despite the fact that the Insureds: (i) had not suffered any injuries that would warrant MRIs; and in any case (ii) had not, and could not have, legitimately tried and failed a course of conservative treatment.

70. Moreover, in a legitimate clinical setting, it is improbable – to the point of impossibility – that a large cohort of patients involved in minor automobile accidents not only would suffer injuries to both their cervical and lumbar spines as the result of the minor accidents, but would suffer injuries serious enough to genuinely warrant both cervical and lumbar MRIs in

the immediate aftermath of the underlying accidents, before the patients had tried and failed a legitimate course of conservative treatment.

71.     Even so – and as set forth above – the Defendants routinely purported to perform and/or provide both cervical and lumbar MRIs with respect to Insureds who had not been seriously injured in their accidents, did not plausibly require both cervical and lumbar MRIs (or any MRIs), and in any case did not require cervical and lumbar MRIs as a first-line diagnostic test, before they had failed a legitimate course of conservative treatment.

72.     The Defendants provided their MRIs – or purported to provide them – pursuant to a fraudulent, pre-determined protocol designed to provide false or exaggerated injury "diagnoses" early on in Insureds' courses of treatment, so as to create a false justification for continued, medically unnecessary treatment and billing by the Radiology Clinics' referral sources, to support the Insureds' personal injury claims, and to ensure that the Radiology Clinics would continue to receive a steady stream of MRI referrals.

73.     There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

74.     An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

75.     It is improbable that two or more Insureds involved in any single motor vehicle accident would suffer substantially similar injuries or exhibit substantially similar symptomatology as the result of the accident.

76.     It likewise is improbable that two or more Insureds involved in any single motor vehicle accident not only would suffer from substantially similar injuries and symptomatology as

the result of the accident, but also would require MRIs of the same parts of their bodies as the result of the accident, at or around the same time after the accident.

77.     It is even more improbable – to the point of impossibility – that this legitimately would occur over and over again.

78.     Even so – and in keeping with the fact that the Defendants provided their MRIs pursuant to a pre-determined, fraudulent protocol, rather than based on medical necessity – the Defendants routinely purported to provide substantially identical, medically unnecessary MRIs, on or about the same date, to two or more Insureds who had been in the same underlying accident, typically before the Insureds legitimately could have tried and failed a course of conservative treatment.

79.     For example:

(i)     On March 19, 2015, two Insureds – MP and JF – were involved in the same automobile accident. MP and JF were different ages, in different physical condition, and experienced the impact from different positions in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were different, and resolved at different rates. They did not require substantially identical MRIs on or about the same date after their accident. Even so, Advanced Diagnostic, Johnson, and Desai submitted bills to GEICO for MRI scans purportedly performed on the cervical, lumbar, and thoracic spines of MP and JF at AD-Brandon on April 22, 2015.

(ii)    On July 13, 2015, two Insureds – MR and RR – were involved in the same automobile accident. MR and RR were different ages, in different physical condition, and experienced the impact from different positions in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were different, and resolved at different rates. They did not require substantially identical MRIs on or about the same date after their accident. Even so, Advanced Diagnostic, Johnson, and Desai submitted bills to GEICO for an MRI purportedly performed on the lumbar spine of both MR and RR at AD-Tampa 1 on August 31, 2015.

(iii)   On February 20, 2016, two Insureds – CV and IP – were involved in the same automobile accident. CV and IP were different ages, in different physical condition, and experienced the impact from different positions in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were different, and resolved at different rates. They did not require substantially identical MRIs on or about the same date after their accident. Even so, Advanced Diagnostic, Johnson, Zimmelman, and Desai submitted bills to GEICO for MRI scans purportedly

performed on the lumbar spines of both CV and IP at AD-Tampa 2 on April 13, 2016. Then, Advanced Diagnostic submitted bills to GEICO for an MRI purportedly performed on the cervical spine of both CV and IP at AD-Tampa 2 on May 11, 2016.

(iv)     On May 26, 2016, two Insureds – JS and HP – were involved in the same automobile accident. JS and HP were different ages, in different physical condition, and experienced the impact from different positions in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were different, and resolved at different rates. They did not require substantially identical MRIs on or about the same date after their accident. Even so, Advanced Diagnostic, Johnson, Zimmelman, and Desai submitted bills to GEICO for MRI scans purportedly performed on the cervical spines and lumbar spines of JS and HP at AD-Orlando 2 on June 8, 2016.

(v)      On June 28, 2016, three Insureds – SS, MA, and BS – were involved in the same automobile accident. SS, MA, and BS were different ages, in different physical condition, and experienced the impact from different positions in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were different, and resolved at different rates. They did not require substantially identical MRIs on or about the same date after their accident. Even so, Advanced Diagnostic, Johnson, Zimmelman, and Desai submitted bills to GEICO for MRI scans purportedly performed on the cervical spines of SS, MA, and BS on July 15, 2016, the lumbar spines of SS and MA on July 15, 2016, and the lumbar spine of BS on August 17, 2016, all at AD-Palm Beach Gardens.

(vi)     On July 25, 2016, two Insureds – MJ and JG – were involved in the same automobile accident. MJ and JG were different ages, in different physical condition, and experienced the impact from different positions in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were different, and resolved at different rates. They did not require substantially identical MRIs on or about the same date after their accident. Even so, Advanced Diagnostic, Johnson, and Desai submitted bills to GEICO for MRI scans purportedly performed on the cervical and lumbar spines of MJ and JG  at AD-Orlando 1 on August 23, 2016.

(vii)    On August 10, 2016, two Insureds – NF and EF – were involved in the same automobile accident. NF and EF were different ages, in different physical condition, and experienced the impact from different positions in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were different, and resolved at different rates. They did not require substantially identical MRIs on or about the same date after their accident. Even so, Advanced Diagnostic, Johnson, Zimmelman, and Desai submitted bills to GEICO for MRI scans purportedly performed on the cervical spines and lumbar spines of NF on September 19, 2016 and EF on September 21, 2016 at AD-Orlando 2.

(viii)   On September 1, 2016, three Insureds – AS, OM, and JH – were involved in the same automobile accident. AS, OM, and JH were different ages, in different physical condition, and experienced the impact from different positions in the vehicle. To the

extent that they suffered any injuries at all in the accident, their injuries were different, and resolved at different rates. They did not require substantially identical MRIs on or about the same date after their accident. Even so, Advanced Diagnostic, Johnson, and Desai submitted bills to GEICO for an MRI scan purportedly performed on the cervical spine of both AS and OM at AD-Tampa 1 on September 7, 2016, and an MRI scan purportedly performed on the cervical spine of JH at AD-Tampa 1 on September 8, 2016.

(ix)    On October 13, 2016, two Insureds – JR and JL – were involved in the same automobile accident. JR and JL were different ages, in different physical condition, and experienced the impact from different positions in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were different, and resolved at different rates. They did not require substantially identical MRIs on or about the same date after their accident. Even so, Advanced Diagnostic, Johnson, and Desai submitted bills to GEICO for MRI scans purportedly performed on the cervical spines of JR on November 3, 2016 and JL on November 10, 2016 at AD-Orlando 1.

(x)    On March 8, 2017, two Insureds – AB and RB – were involved in the same automobile accident. AB and RB were different ages, in different physical condition, and experienced the impact from different positions in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were different, and resolved at different rates. They did not require substantially identical MRIs on or about the same date after their accident. Even so, Advanced Diagnostic, Johnson, Zimmelman, and Desai submitted bills to GEICO for MRI scans purportedly performed on RB's cervical spine and lumbar spine at AD-Tampa 2 on March 23, 2017, and on AB's cervical spine and lumbar spine at AD-Tampa 2 on March 29, 2017.

(xi)    On March 24, 2017, two Insureds – ED and KD – were involved in the same automobile accident. ED and KD were different ages, in different physical condition, and experienced the impact from different positions in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were different, and resolved at different rates. They did not require substantially identical MRIs on or about the same date after their accident. Even so, CareFirst and Desai submitted bills to GEICO for MRI scans purportedly performed on the cervical spines and lumbar spines of ED and KD at CareFirst on March 31, 2017.

(xii)    On April 3, 2017, two Insureds – AS and KT – were involved in the same automobile accident. AS and KT were different ages, in different physical condition, and experienced the impact from different positions in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were different, and resolved at different rates. They did not require substantially identical MRIs on or about the same date after their accident. Even so, Advanced Diagnostic, Johnson, Zimmelman, and Desai submitted bills to GEICO for MRI scans purportedly performed on the lumbar spines of AS and KT on May 11, 2017 at AD-Palm Beach Gardens.

(xiii)   On May 28, 2017, two Insureds – RC and RC – were involved in the same automobile accident. RC and RC were different ages, in different physical condition, and experienced the impact from different positions in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were different, and resolved at different rates. They did not require substantially identical MRIs on or about the same date after their accident. Even so, Advanced Diagnostic, Johnson, Martinez, and Desai submitted bills to GEICO for MRI scans purportedly performed on the cervical spines and lumbar spines of RC and RC at AD-Lakeland on April 18, 2019.

(xiv)   On June 28, 2017, two Insureds – JK and KG – were involved in the same automobile accident. JK and KG were different ages, in different physical condition, and experienced the impact from different positions in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were different, and resolved at different rates. They did not require substantially identical MRIs on the same date as their accident. Even so, Advanced Diagnostic, Johnson, Zimmelman, and Desai submitted bills to GEICO for MRI scans purportedly performed on the cervical spine and lumbar spine of both JK and KG at AD-Kissimmee on June 28, 2017.

(xv)   On October 12, 2017, two Insureds – CC and WS – were involved in the same automobile accident. CC and WS were different ages, in different physical condition, and experienced the impact from different positions in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were different, and resolved at different rates. They did not require substantially identical MRIs on or about the same date after their accident. Even so, CareFirst and Desai submitted bills to GEICO for MRI scans purportedly performed on the cervical spines and lumbar spines of CC and WS at CareFirst on October 22, 2017.

(xvi)   On October 12, 2017, two Insureds – SD and MD – were involved in the same automobile accident. SD and MD were different ages, in different physical condition, and experienced the impact from different positions in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were different, and resolved at different rates. They did not require substantially identical MRIs on or about the same date after their accident. Even so, Advanced Diagnostic, Johnson, Martinez, and Desai submitted bills to GEICO for MRI scans purportedly performed on the cervical spines and lumbar spines of SD and MD at AD-Lakeland on November 29, 2017.

(xvii)   On February 26, 2018, three Insureds – OD, MM, and AD – were involved in the same automobile accident. OD, MM, and AD were different ages, in different physical condition, and experienced the impact from different positions in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were different, and resolved at different rates. They did not require substantially identical MRIs on or about the same date after their accident. Even so, CareFirst and Desai submitted bills to GEICO for MRI scans purportedly performed on the cervical spines of OD, MM, and AD at CareFirst on March 9, 2018.

(xviii)   On March 16, 2018, two Insureds – AC and HC – were involved in the same automobile accident. AC and HC were different ages, in different physical condition, and experienced the impact from different positions in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were different, and resolved at different rates. They did not require substantially identical MRIs on or about the same date after their accident. Even so, CareFirst and Desai submitted bills to GEICO for MRI scans purportedly performed on the cervical spines and lumbar spines of AC and HC at CareFirst on April 3, 2018.

(xix)   On April 7, 2018, two Insureds – LV and EH – were involved in the same automobile accident. LV and EH were different ages, in different physical condition, and experienced the impact from different positions in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were different, and resolved at different rates. They did not require substantially identical MRIs on or about the same date after their accident. Even so, Advanced Diagnostic, Johnson, and Desai submitted bills to GEICO for MRI scans purportedly performed on the lumbar spines of LV and EH at AD-Tampa 1 on April 26, 2018.

(xx)   On April 20, 2018, two Insureds – BH and AH – were involved in the same automobile accident. BH and AH were different ages, in different physical condition, and experienced the impact from different positions in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were different, and resolved at different rates. They did not require substantially identical MRIs on or about the same date after their accident. Even so, CareFirst and Desai submitted bills to GEICO for MRI scans purportedly performed on the cervical spines and lumbar spines of BH and AH at CareFirst on May 3, 2018.

(xxi)   On June 4, 2018, two Insureds – EA and EB – were involved in the same automobile accident. EA and EB were different ages, in different physical condition, and experienced the impact from different positions in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were different, and resolved at different rates. They did not require substantially identical MRIs on or about the same date after their accident. Even so, CareFirst and Desai submitted bills to GEICO for MRI scans purportedly performed on the cervical spines and lumbar spines of EA and EB at CareFirst on June 11, 2018.

(xxii)   On July 13, 2018, two Insureds – AA and NR – were involved in the same automobile accident. AA and NR were different ages, in different physical condition, and experienced the impact from different positions in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were different, and resolved at different rates. They did not require substantially identical MRIs on or about the same date after their accident. Even so, CareFirst and Desai submitted bills to GEICO for MRI scans purportedly performed on the cervical spines and lumbar spines of AA and NR at CareFirst on July 21, 2018.

(xxiii)   On August 4, 2018, two Insureds – EC and MP – were involved in the same automobile accident. EC and MP were different ages, in different physical condition,

and experienced the impact from different positions in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were different, and resolved at different rates. They did not require substantially identical MRIs on or about the same date after their accident. Even so, Advanced Diagnostic, Johnson, Zimmelman, and Desai submitted bills to GEICO for MRI scans purportedly performed on the cervical spines and lumbar spines of EC on September 6, 2018 and MP on September 13, 2018 at AD-Orlando 2.

(xxiv) On November 15, 2018, three Insureds – MG, AG, and MG – were involved in the same automobile accident. MG, AG, and MG were different ages, in different physical condition, and experienced the impact from different positions in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were different, and resolved at different rates. They did not require substantially identical MRIs on or about the same date after their accident. Even so, CareFirst and Desai submitted bills to GEICO for MRI scans purportedly performed on the cervical spines and lumbar spines of MG and AG, and an MRI purportedly performed on the lumbar spine of MG at CareFirst on November 29, 2019.

(xxv) On December 27, 2018, two Insureds – AL and FL – were involved in the same automobile accident. AL and FL were different ages, in different physical condition, and experienced the impact from different positions in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were different, and resolved at different rates. They did not require substantially identical MRIs on or about the same date after their accident. Even so, Advanced Diagnostic, Johnson, and Desai submitted bills to GEICO for MRI scans purportedly performed on the cervical and lumbar spines of AL on January 12, 2019 and FL on January 8, 2019 at AD-Brandon.

(xxvi) On March 29, 2019, two Insureds – BD and JD – were involved in the same automobile accident. BD and JD were different ages, in different physical condition, and experienced the impact from different positions in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were different, and resolved at different rates. They did not require substantially identical MRIs on or about the same date after their accident. Even so, Advanced Diagnostic, Johnson, Martinez, and Desai submitted bills to GEICO for MRI scans purportedly performed on the cervical spines and lumbar spines of BD and JD at AD-Lakeland on April 18, 2019.

(xxvii) On May 26, 2019, two Insureds – AM and IM– were involved in the same automobile accident. AM and IM were different ages, in different physical condition, and experienced the impact from different positions in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were different, and resolved at different rates. They did not require substantially identical MRIs on or about the same date after their accident. Even so, Advanced Diagnostic, Johnson, Zimmelman, and Desai submitted bills to GEICO for MRI scans purportedly performed on the cervical spine of both AM and IM at AD-Kissimmee on June 8, 2019.

(xxviii) On June 16, 2019, two Insureds – JB and HB – were involved in the same automobile accident. JB and HB were different ages, in different physical condition, and experienced the impact from different positions in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were different, and resolved at different rates. They did not require substantially identical MRIs on or about the same date after their accident. Even so, CareFirst and Desai submitted bills to GEICO for MRI scans purportedly performed on the cervical spines and lumbar spines of JB and HB at CareFirst on June 29, 2019.

(xxix) On June 16, 2019, two Insureds – DC and KC – were involved in the same automobile accident. DC and KC were different ages, in different physical condition, and experienced the impact from different positions in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were different, and resolved at different rates. They did not require substantially identical MRIs on or about the same date after their accident. Even so, Advanced Diagnostic, Johnson, Martinez, and Desai submitted bills to GEICO for MRI scans purportedly performed on DC's cervical spine and lumbar spine at AD-Lakeland on June 24, 2019, and on KC's cervical spine and lumbar spine at AD-Lakeland on July 1, 2019.

(xxx) On October 9, 2019, two Insureds – PM and RM – were involved in the same automobile accident. PM and RM were different ages, in different physical condition, and experienced the impact from different positions in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were different, and resolved at different rates. They did not require substantially identical MRIs on or about the same date after their accident. Even so, CareFirst and Desai submitted bills to GEICO for MRI scans purportedly performed on the cervical spines and lumbar spines of PM and RM at CareFirst on October 17, 2019.

80.     These are only representative examples. In the claims identified in Exhibits "1" and "2", the Defendants routinely purported to provide substantially identical, medically unnecessary MRIs on or about the same date to two or more Insureds who had been involved in the same accident, despite the fact that the Insureds were differently situated.

81.     In the claims identified in Exhibits "1" and "2", the Defendants routinely falsely represented that the underlying MRIs were medically necessary, lawfully provided, and eligible for PIP reimbursement in the first instance.

82.     In fact, the MRIs were neither medically necessary nor lawfully provided. Instead, the MRIs were provided – to the extent that they were provided at all – pursuant to a pre-determined protocol designed to maximize the billing the Defendants could submit through the Radiology

Clinics to GEICO and other insurers, not to treat or otherwise benefit the Insureds who were subjected to it.

**B.      The False and Exaggerated MRI "Results"**

83.      Not only did the Defendants routinely bill for medically unnecessary MRIs, but they also routinely falsified and exaggerated the purported "results" of the MRIs, in order to make it appear as if the Insureds had suffered from serious injuries as the result of their automobile accidents, when in fact they had not.

84.      It is improbable – to the point of impossibility – that a large cohort of patients who were involved in relatively minor accidents not only would suffer disc bulges or herniations as the result of the accidents, but would suffer numerous disc herniations at multiple levels of their spines as the result of the accidents.

85.      Even so, in the claims identified in Exhibits "1" and "2", the Defendants routinely falsely represented that the Insureds suffered numerous disc herniations at multiple levels of their spines as the result of minor automobile accidents that could not legitimately have caused the Insureds to suffer those injuries.

86.      For example:

(i)      On March 15, 2015, an Insured named JF was involved in a minor automobile accident. In keeping with the fact that the accident was minor, JF did not visit any hospital emergency room following the accident, and first sought medical treatment at a local medical practice more than two weeks after the motor vehicle accident. To the extent that JF experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, not disc herniations. Even so, after purportedly taking MRIs of JF's cervical spine and lumbar spine at AD-Brandon on April 22, 2015, Advanced Diagnostic, Johnson, and Desai falsely reported that JF had disc herniations at the C6-7, L2-3, L3-4 levels and disc herniations at the  C3-4, L4-5, L5-S1 levels of his spine.

(ii)      On June 28, 2016, an Insured named SS was involved in an automobile accident. In keeping with the fact that the accident was minor, SS did not seek treatment at any hospital after the accident. Instead, SS first sought treatment at a local medical office days after the accident. To the extent that SS experienced any health issues

at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, not disc herniations. Even so, after purportedly taking MRIs of that SS's cervical spine and lumbar spine at AD-Palm Beach Gardens on July 15, 2016, Advanced Diagnostic, Johnson, Zimmelman, and Desai falsely reported that SS had disc herniations at the C3-4, C5-6, C6-7, L2-3, and L5-S1 levels of her spine.

(iii)     On August 10, 2016, an Insured named that NF was involved in a minor automobile accident. In keeping with the fact that the accident was minor, NF was not seriously injured and did not seek treatment at a hospital emergency room after the accident. Instead, NF first sought treatment at a local medical office almost two weeks after the accident. To the extent that NF experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, not disc herniations. Even so, after purportedly taking MRIs of that NF's cervical spine and lumbar spine at AD-Orlando 2 on September 19, 2016, Advanced Diagnostic, Johnson, Zimmelman, and Desai falsely reported that NF had disc herniations at the C4-5, C5-6, C6-7, L2-3, and L5-S1 levels of her spine.

(iv)     On October 20, 2016, an Insured named LB was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that LB's vehicle was drivable following the accident, and that LB refused medical attention at the scene. In keeping with the fact that LB was not seriously injured, LB did not visit any hospital emergency room following the accident. To the extent that LB experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, not disc herniations. Even so, after purportedly taking MRIs of LB's cervical spine and lumbar spine at AD-Tampa 1 on November 11, 2016, Advanced Diagnostic, Johnson, and Desai falsely reported that LB had disc herniations at the C5-6, C7-T1, and L3-4 levels of her spine.

(v)     On March 24, 2017, an Insured named ED was involved in a minor automobile accident. In keeping with the fact that the accident was minor, ED was not seriously injured and was discharged from the hospital emergency room hours after arriving without being admitted to the hospital. To the extent that ED experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, not disc herniations. Even so, after purportedly taking MRIs of ED's cervical spine and lumbar spine at CareFirst on March 31, 2017, CareFirst and Desai falsely reported that ED had disc herniations at the C2-3, C3-4, and L5-S1 levels of his spine.

(vi)     On March 24, 2017, an Insured named KD was involved in a minor automobile accident. In keeping with the fact that the accident was minor, KD was not seriously injured and was discharged from the hospital emergency room hours after arriving without being admitted to the hospital. To the extent that KD experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, not disc herniations. Even so, after purportedly taking MRIs of KD's cervical spine and lumbar spine at CareFirst on March 31, 2017,

CareFirst and Desai falsely reported that KD had "disc herniations" at the C4-5, L4-5, and L5-S1 levels of his spine.

(vii)    On June 17, 2017, an Insured named AA was involved in an automobile accident. In keeping with the fact that the accident was minor AA did not seek treatment at any hospital after the accident. Instead, SS first sought treatment at a local medical office days after the accident.To the extent that AA experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, not disc herniations. Even so, after purportedly taking MRIs of that AA's cervical spine and thoracic spine at AD-Palm Beach Gardens on June 20, 2017, Advanced Diagnostic, Johnson, Zimmelman, and Desai falsely reported that AA had disc herniations at the C3-4, C5-6, C6-7, and T7-8 levels of her spine.

(viii)    On June 28, 2017, an Insured named IG was involved in a minor automobile accident. In keeping with the fact that the accident was minor, IG was not seriously injured and was discharged from the hospital emergency room hours after arriving without being admitted to the hospital. To the extent that IG experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, not disc herniations. Even so, after purportedly taking MRIs of IG's cervical spine and lumbar spine at AD-Kissimmee on the same date of the accident, Advanced Diagnostic, Johnson, Zimmelman, and Desai falsely reported that IG had disc herniations at the C6-7, L4-5, and L5-S1 levels of his spine.

(ix)    On August 18, 2017, an Insured named MH was involved in a minor automobile accident. In keeping with the fact that the accident was minor, MH did not complain of any injuries at the scene and did not seek treatment at any hospital after the accident. Instead, MH first sought treatment at a local medical office a few days after the accident. To the extent that MH experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, not disc herniations. Even so, after purportedly taking MRIs of MH's cervical spine and lumbar spine at AD-Lakeland on August 25, 2018, Advanced Diagnostic, Johnson, Martinez, and Desai falsely reported that MH had disc herniations at the C3-4, C4-5, C5-6, C6-7, and L5-S1 levels of her spine.

(x)    On October 8, 2017, an Insured named OP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that OP's vehicle was drivable following the accident, and that OP did not complain of any pain at the scene. In keeping with the fact that OP was not seriously injured, OP did not visit any hospital emergency room following the accident. To the extent that OP experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, not disc herniations. Even so, after purportedly taking MRIs of OP's cervical spine and lumbar spine at AD-Orlando 1 on October 31, 2017, Advanced Diagnostic, Johnson, and Desai falsely reported that OP had disc herniations at the C3-4, C4-5, and L5-S1 levels of his spine.

(xi)    On January 19, 2018, an Insured named AT was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that AT's airbag was not deployed as a result of the accident, and that AT did not complain of any pain at the scene. In keeping with the fact that AT was not seriously injured, AT did not visit any hospital emergency room following the accident. To the extent that AT experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, not disc herniations. Even so, after purportedly taking MRIs of AT's cervical spine and lumbar spine at AD-Tampa 1 on February 27, 2018, Advanced Diagnostic, Johnson, and Desai falsely reported that AT had disc herniations at the C5-6, C6-7, and L5-S1 levels of his spine.

(xii)   On May 22, 2018, an Insured named MP was involved in a minor automobile accident. In keeping with the fact that the accident was minor, MP did not seek treatment at a hospital after the accident. Instead, she visited a chiropractor's office the following day where she described the accident as being rear-ended. To the extent MP experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, not disc herniations. Even so, after purportedly taking MRIs of MP's cervical spine and lumbar spine at AD-Orlando 1 on June 13, 2018, Advanced Diagnostic, Johnson, and Desai falsely reported that MP had disc herniations at the C3-4 and L3-4 levels of her spine.

(xiii)  On June 17, 2018, an Insured named JD was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision. In keeping with the fact that JD was not seriously injured, JD visited the emergency room following the accident and was discharged hours after arriving without being admitted to the hospital. To the extent that JD experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, not disc herniations. Even so, after purportedly taking MRIs of JD's cervical spine and lumbar spine at AD-Tampa 1 on July 6, 2018, Advanced Diagnostic, Johnson, and Desai falsely reported that JD had disc herniations at the C5-6 and L5-S1 levels of her spine.

(xiv)   On July 19, 2018, an Insured named KM was involved in a minor automobile accident. In keeping with the fact that the accident was minor, KM was not seriously injured and was discharged from the hospital emergency room hours after arriving without being admitted to the hospital. To the extent that KM experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, not disc herniations. Even so, after purportedly taking MRIs of KM's cervical spine and lumbar spine at AD-Lakeland on July 31, 2018, Advanced Diagnostic, Johnson, Martinez, and Desai falsely reported that KM had disc herniations at the C3-4 and L5-S1 levels of her spine.

(xv)    On June 27, 2018, an Insured named OS was involved in a minor automobile accident. In keeping with the fact that the accident was minor, OS was not seriously injured and was not transported to a hospital emergency room following the accident. To the extent that OS experienced any health issues at all as the result of

the accident, they were minor soft tissue injuries that did not require MRIs, not disc herniations. Even so, after purportedly taking MRIs of OS's cervical spine and lumbar spine at CareFirst on July 24, 2018, CareFirst and Desai falsely reported that OS had disc herniations at the C2-3, C3-4, C4-5, C5-6, T1-2, T2-3, L1-2, and L5-S1 levels of his spine.

(xvi)    On July 24, 2018, an Insured named CA was involved in an automobile accident. The contemporaneous police report, first responder records, and hospital records indicated that the accident was a low-speed, low-impact collision that caused only minor damage to CA's vehicle, that CA's vehicle was drivable following the accident, and that CA was not seriously injured in the accident. To the extent that CA experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, not disc herniations. Even so, after purportedly taking MRIs of CA's cervical and lumbar spine on August 3, 2018 at AD-Tampa 1, Advanced Diagnostic, Johnson, and Desai falsely reported that CA had disc herniations at the C3-4, C4-5, C5-6, and L5-S1 levels of his spine.

(xvii)    On July 25, 2018, an Insured named VP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that VP's vehicle was drivable following the accident, and that VP did not complain of any pain at the scene. In keeping with the fact that VP was not seriously injured, VP did not visit any hospital emergency room following the accident. To the extent that VP experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, not disc herniations. Even so, after purportedly taking an MRI of VP's cervical spine on August 15, 2018, and lumbar spine on October 25, 2018 at AD-Brandon, Advanced Diagnostic, Johnson, and Desai falsely reported that VP had disc herniations at the L4-5, L5-S1, and T2-3 levels of his spine.

(xviii)    On August 4, 2018, an Insured named EC was involved in a minor automobile accident. In keeping with the fact that the accident was minor, EC was not seriously injured and was discharged from the hospital emergency room hours after arriving without being admitted to the hospital. To the extent that EC experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, not disc herniations. Even so, after purportedly taking MRIs of EC's cervical spine and lumbar spine at AD-Orlando 2 on September 6, 2018, Advanced Diagnostic, Johnson, Zimmelman, and Desai falsely reported that EC had disc herniations at the C3-4, C4-5, C6-7, L3-4, L4-5, and L5-S1 levels of her spine.

(xix)    On August 4, 2018, an Insured named JS was involved in a minor automobile accident. In keeping with the fact that the accident was minor, JS was not seriously injured and was discharged from the hospital emergency room hours after arriving without being admitted to the hospital. To the extent that JS experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, not disc herniations. Even so, after purportedly taking MRIs of JS's cervical spine and lumbar spine at AD-Orlando 2 on June 8, 2016, Advanced

Diagnostic, Johnson, Zimmelman, and Desai falsely reported that JS had disc herniations at the C2-3, C3-4, C4-5, C5-6, C6-7, and L3-4 levels of his spine.

(xx)     On October 12, 2018, an Insured named AF was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that AF's vehicle was drivable following the accident, and that AF did not complain of any pain at the scene. In keeping with the fact that AF was not seriously injured, AF did not visit any hospital emergency room following the accident. To the extent that AF experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, not disc herniations. Even so, after purportedly taking MRIs of AF's cervical spine and lumbar spine at AD-Tampa 2 on October 24, 2018, Advanced Diagnostic, Johnson, Zimmelman, and Desai falsely reported that AF had disc herniations at the C3-4, C4-5, C5-6, C6-7, and L5-S1 levels of his spine.

(xxi)    On March 29, 2019, an Insured named JD was involved in an automobile accident. In keeping with the fact that JD was not seriously injured, he sought treatment at a hospital emergency room immediately following the accident and the emergency room record indicated that JD had no evidence of traumatic injury. To the extent that OP experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, not disc herniations. Even so, after purportedly taking MRIs of JD's cervical spine and lumbar spine at AD-Lakeland on April 18, 2019, Advanced Diagnostic, Johnson, Martinez, and Desai falsely reported that JD had disc herniations at the C2-3, C3-4, C4-5, C5-6, C6-7, L3-4, L4-5, and L5-S1 levels of his spine.

(xxii)   On April 28, 2019, an Insured named SB was involved in an automobile accident. In keeping with the fact that the accident was minor SB  was not seriously injured and did not seek treatment at any hospital after the accident. Instead, SB first sought treatment at a local medical office the day after the accident.To the extent that SB experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, not disc herniations. Even so, after purportedly taking MRIs of that SB's cervical spine and lumbar spine at AD-Palm Beach Gardens on May 13, 2019, Advanced Diagnostic, Johnson, Zimmelman, and Desai falsely reported that SB had disc herniations at the C5-6 and L5-S1 levels of her spine.

(xxiii)  On January 18, 2020, an Insured named LV was involved in a minor automobile accident. In keeping with the fact that the accident was minor, LV was not seriously injured and was not transported to a hospital emergency room after the accident. LV drove himself to the hospital emergency room and was discharged hours after arriving without being admitted to the hospital with a diagnosis of minor soft tissue injuries that did not require MRIs, not disc herniations. Even so, after purportedly taking MRIs of LV's cervical spine and lumbar spine at CareFirst on February 1, 2020, CareFirst and Desai falsely reported that LV had disc herniations at the C3-4, C4-5, C7-T1, L2-3, L3-4, and L4-5 levels of his spine.

87.     These are only representative examples. In the claims identified in Exhibits "1" and "2", the Defendants routinely falsely represented that the Insureds suffered extensive disc herniations at multiple levels of their spines as the result of minor accidents that could not legitimately have caused the herniations.

88.     The Defendants issued these false and exaggerated "findings" in order to create the appearance of serious injuries where none actually existed, so as to ensure a steady stream of referrals to the Radiology Clinics for medically unnecessary MRIs.

89.     In addition to falsely reporting disc herniations, the Defendants frequently falsely represented that, as a result of their accidents, the Insureds in the claims identified in Exhibits "1" and "2" suffered from disc bulges that were compressing or indenting their thecal sacs.

90.     A disc bulge is when a spinal disc appears symmetrical, but there is a small outpouching or protrusion of the disc with no significant herniation.

91.     Disc bulges are extremely common, to the point where many adults have a disc bulge at one or more spinal levels without experiencing any symptoms.

92.     There are a number of factors that can cause bulging discs, including – most commonly – the ordinary degenerative changes attendant to aging.

93.     However, it is improbable that a bulging disc actually would be caused by a relatively minor automobile accident.

94.     It is even more improbable that a minor accident actually would cause a patient to suffer from numerous bulging discs at multiple levels of his or her spine.

95.     It is even more improbable – to the point of impossibility – that this legitimately would occur over and over again within a large cohort of patients being treated within a small group of related radiology practices.

96.     Even so, in order to create the false appearance that the Insureds in the claims identified in Exhibits "1" and "2" suffered some serious injuries as the result of their typically-minor accidents, the Defendants routinely falsely represented that the Insureds not only suffered from multiple disc bulges, but that the disc bulges were causally related to the Insureds' accidents.

97.     What is more, in order to create the false appearance that the purported disc bulges represented a serious condition, the Defendants routinely indicated that virtually every disc bulge was "compressing" or "indenting" the Insureds' thecal sacs.

98.     Similarly, in the many instances in which the Defendants falsely represented that the Insureds suffered disc herniations as the result of their accidents, the Defendants likewise routinely indicated that the purported disc herniations were compressing the Insureds' thecal sacs.

99.     There was no legitimate reason for the Defendants to report that the Insureds' purported disc bulges or herniations were "compressing" or "indenting" the Insureds' thecal sacs. Thecal sac "compression" or "indentation" has no clinical significance. These thecal sac "findings" played no role in the diagnoses or treatment of the Insureds and were inserted by the Defendants into their MRI reports solely in order to create the false appearance that the Insureds suffered from serious injuries warranting extensive treatment, when in fact they had not.

100.    For example:

(i)     On June 24, 2016, an Insured named KG was involved in an automobile accident. In keeping with the fact that the accident was minor, KG was not seriously injured and did not seek treatment at any hospital after the accident. Instead, KG first sought treatment at a local chiropractic office a few days after the accident. To the extent that KG experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, not disc herniations. Even so, Advanced Diagnostic, Johnson, and Desai submitted a bill to GEICO for MRI scans purportedly performed on the lumbar spine and cervical spine of KG on July 19, 2016 at AD-Tampa 1. In support of the bill, Advanced Diagnostic, Johnson, and Desai submitted MRI reports by Desai containing false and/or exaggerated "findings" to the effect that: (i) KG suffered a disc bulge compressing the thecal sac at the L4-5, C2-3, C3-4, C4-5, and C6-7 levels; (ii) KG suffered a disc

herniation at the C5-6, L3-4, and L5-S1 levels; (iii) the disc herniations at the C5-6 and L5-S1 levels were compressing the thecal sac; and (iv) the disc herniation at the L5-S1 level was caused by KG's motor vehicle accident.

(ii)    On June 28, 2016, an Insured named SS was involved in an automobile accident. In keeping with the fact that the accident was minor, SS did not seek treatment at any hospital after the accident. Instead, SS first sought treatment at a local medical office days after the accident.To the extent that SS experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, not disc herniations. Even so, Advanced Diagnostic, Johnson, Zimmelman, and Desai purported to provide and submitted bills to GEICO for MRI scans purportedly performed on the lumbar spine and cervical spine of SS on July 15, 2016 at AD-Palm Beach Gardens. In support of the bill, Advanced Diagnostic, Johnson, Zimmelman, and Desai included false and/or exaggerated "findings" to the effect that: (i) SS suffered a disc bulge compressing the thecal sac at the C4-5 and L4-5 levels; (ii) SS suffered a disc herniation at the at the C3-4, C5-6, and L5-S1 levels; and (iii) that the reported disc herniation at the L5-S1 level in SS's lumbar spine was caused by SS's June 28, 2016 accident.

(iii)   On August 10, 2016, an Insured named that NF was involved in a minor automobile accident. In keeping with the fact that the accident was minor, NF was not seriously injured and did not seek treatment at a hospital emergency room after the accident. Instead, NF first sought treatment at a local medical office almost two weeks after the accident. To the extent that NF experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, not disc herniations. Even so, Advanced Diagnostic, Johnson, Zimmelman, and Desai purported to provide and submitted bills to GEICO for MRI scans purportedly performed on the lumbar spine and cervical spine of NF on September 19, 2016 at AD-Orlando 2. In support of the bill, Advanced Diagnostic, Johnson, Zimmelman, and Desai included reports by Desai containing false and/or exaggerated "findings" to the effect that: (i) NF suffered a disc bulge compressing the thecal sac at the C2-3, L1-2, L3-4, and L4-5 levels; (ii) NF suffered a disc herniation compressing the thecal sac at the at the L2-3 and L5-S1 levels; and (iii) NF suffered a disc herniation compressing the "anterior cord" at the at the C4-5, C5-6, and C6-7 levels.

(iv)    On October 20, 2016, an Insured named LB was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that LB's vehicle was drivable following the accident, and that LB refused medical attention at the scene. In keeping with the fact that LB was not seriously injured, LB did not visit any hospital emergency room following the accident. To the extent that LB experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, not disc herniations. Even so, Advanced Diagnostic, Johnson, and Desai submitted a bill to GEICO for MRI scans  purportedly performed on the lumbar spine and cervical spine of LB on November 11, 2016 at AD-Tampa 1. In support of the bill, Advanced Diagnostic, Johnson, and Desai included MRI reports by Desai containing false and/or exaggerated "findings" to the effect that: (i) LB suffered a

disc bulge compressing the thecal sac at the C2-3, C3-4, C4-5, L2-3, and L5-S1 levels; and (ii) LB suffered from a disc herniation compressing the thecal sac at the C5-6, C6-7, and C6-T1 levels.

(v)     On June 17, 2017, an Insured named AA was involved in an automobile accident. In keeping with the fact that the accident was minor AA did not seek treatment at any hospital after the accident. Instead AA first sought treatment at a local medical office days after the accident.To the extent that AA experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, not disc herniations. Even so, Advanced Diagnostic, Johnson, Zimmelman, and Desai purported to provide and submitted bills to GEICO for an MRI scan purportedly performed on the cervical spine of AA on June 20, 2017 at AD-Palm Beach Gardens. In support of the bill, Advanced Diagnostic, Johnson, Zimmelman, and Desai included reports by Desai containing false and/or exaggerated "findings" to the effect that: (i) AA suffered a disc bulge compressing the thecal sac at the C4-5 level; and (ii) AA suffered a disc herniation compressing the thecal sac at the C3-4, C5-6, and C6-7 levels.

(vi)    On June 28, 2017, an Insured named JK was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that JK's vehicle as drivable following the accident, and that JK was not transported to a hospital. In keeping with the fact that JK was not seriously injured, JK did not visit any hospital emergency room following the accident. To the extent that JK experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, not disc herniations. Even so, Advanced Diagnostic, Johnson, Zimmelman, and Desai purported to provide and submitted bills to GEICO for MRI scans purportedly performed on the lumbar spine and cervical spine of JK on June 28, 2017 at AD-Kissimmee. In support of the bill, Advanced Diagnostic, Johnson, Martinez, and Desai included reports by Desai containing false and/or exaggerated "findings" to the effect that: (i) JK suffered a disc bulge compressing the thecal sac at the C4-5, C6-7, L1-2, L2-3, L3-4, and L4-5 levels; and (ii) JK suffered a disc herniation compressing the thecal sac at the C5-6 level.

(vii)   On June 28, 2017, an Insured named KG was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that KG's vehicle as drivable following the accident, and that KG was not transported to a hospital. In keeping with the fact that KG was not seriously injured, KG did not visit any hospital emergency room following the accident. To the extent that KG experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, not disc herniations. Even so, Advanced Diagnostic, Johnson, Zimmelman, and Desai purported to provide and submitted bills to GEICO for an MRI scan purportedly performed on the cervical spine of KG on June 28, 2017 at AD-Kissimmee. In support of the bill, Advanced Diagnostic, Johnson, Zimmelman, and Desai included reports by Desai containing false and/or exaggerated "findings" to the effect that: (i) KG suffered a disc bulge compressing the thecal sac at the C4-5 level; and (ii)

KG suffered disc herniations compressing the thecal sac at the C3-4, C5-6, C6-7 levels.

(viii)   On January 12, 2018, an Insured named TD was involved in a minor automobile accident. In keeping with the fact that the accident was minor, TD was not seriously injured and was discharged from the hospital emergency room hours after arriving without being admitted to the hospital. To the extent that TD experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, not disc herniations. Even so, CareFirst and Desai submitted bills to GEICO for MRI scans purportedly performed on the lumbar spine and cervical spine of TD on March 1, 2018. In support of the bills, CareFirst and Desai included reports by Desai containing false and/or exaggerated "findings" to the effect that: (i) TD suffered a disc bulge indenting the thecal sac at the C4-5 and L4-5 levels; (ii) TD suffered a disc herniation at the C5-6, C6-7, and L4-5 levels; (iii) the disc herniation at the L4-5 level was indenting the thecal sac; and (iv) the reported findings in TD's cervical spine and lumbar spine were caused by TD's motor vehicle accident.

(ix)   On January 16, 2018, an Insured named LP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that LP's vehicle was drivable after the accident, and that LP did not complain of any pain at the scene. In keeping with the fact that LP was not seriously injured, LP did not visit any hospital emergency room following the accident. To the extent that LP experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, not disc herniations. Even so, Advanced Diagnostic, Johnson, and Desai submitted a bill to GEICO for MRI scans purportedly performed on the lumbar spine and cervical spine of LP on February 28, 2018 at AD-Tampa 1. In support of the bill, Advanced Diagnostic, Johnson, and Desai included an MRI report by Desai containing false and/or exaggerated "findings" to the effect that:   (i) LP suffered a disc bulge compressing the thecal sac at the L4-5 level; (ii) LP suffered a disc herniation compressing the thecal sac at the L5-S1 level; and (iii) the findings on LP's lumbar spine, which included a disc bulge and a disc herniation, were caused by LP's motor vehicle accident.

(x)   On January 19, 2018, an Insured named AT was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that AT's airbag was not deployed as a result of the accident, and that AT did not complain of any pain at the scene. In keeping with the fact that AT was not seriously injured, AT did not visit any hospital emergency room following the accident. To the extent that AT experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, not disc herniations. Even so, Advanced Diagnostic, Johnson, and Desai submitted a bill to GEICO for MRI scans purportedly performed on the lumbar spine and cervical spine of AT on February 27, 2018 at AD-Tampa 1. In support of the bill, Advanced Diagnostic, Johnson, and Desai included MRI reports by Desai containing false and/or exaggerated "findings" to the effect that: (i) AT

suffered a disc bulge compressing the thecal sac at the C3-4, C4-5, T1-2, T2-3, L3-4, and L4-5 levels; (ii) AT suffered a disc herniation compressing the thecal sac at the C5-6, C6-7, and L5-S1 levels; and (iii) the findings on AT's cervical spine, which included the a disc bulge and disc herniation at multiple levels, were caused by AT's motor vehicle accident.

(xi)     On March 29, 2018, an Insured named MB was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed and low-impact collision. In keeping with the fact that MB was not seriously injured, MB visited a hospital emergency room following the accident and was discharged hours later. To the extent that MB experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, not disc herniations. Even so, Advanced Diagnostic, Johnson, and Desai submitted a bill to GEICO for MRI scans purportedly performed on the lumbar spine and cervical spine of MB on April 20, 2018 at AD-Orlando 1. In support of the bill, Advanced Diagnostic, Johnson, and Desai included MRI reports by Desai containing false and/or exaggerated "findings" to the effect that: (i) MB suffered a disc bulge compressing the thecal sac at the C3-4, C4-5, and L4-5 levels; (ii) MB suffered from a disc herniation compressing the thecal sac at the C5-6, C6-7, and L5-S1 levels; and (iii) the findings on MB's lumbar spine, which included a disc bulge and a disc herniation, were caused by MB's motor vehicle accident.

(xii)    On May 11, 2018, an Insured named KJ was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that the airbags in KJ's vehicle did not deploy. In keeping with the fact that KJ was not seriously injured, KJ visited the emergency room following the accident and was discharged hours after arriving without being admitted to the hospital. To the extent that KJ experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, not disc herniations. Even so, Advanced Diagnostic, Johnson, and Desai submitted a bill to GEICO for MRI scans purportedly performed on the lumbar spine and cervical spine of KJ on June 5, 2018 at AD-Brandon. In support of the bill, Advanced Diagnostic, Johnson, and Desai included MRI reports by Desai containing false and/or exaggerated "findings" to the effect that: (i) KJ suffered a disc bulge compressing the thecal sac at the C6-7, L3-4, and L4-5 levels; (ii) KJ suffered from a disc herniation compressing the thecal sac at the C3-4, C4-5, C5-6, and L5-S1 levels; and (iii) the disc herniation at the C4-5 level was caused by KJ's motor vehicle accident.

(xiii)   On May 22, 2018, an Insured named MP was involved in a minor automobile accident. In keeping with the fact that the accident was minor, MP did not seek treatment at a hospital after the accident. Instead, she visited a chiropractor's office the following day. To the extent MP experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, not disc herniations. Even so, Advanced Diagnostic, Johnson, and Desai submitted a bill to GEICO for MRI scans purportedly performed on the lumbar spine and cervical spine of MP on June 13, 2018 at AD-Orlando 1. In support of the bill,

Advanced Diagnostic, Johnson, and Desai included MRI reports by Desai containing false and/or exaggerated "findings" to the effect that: (i) MP suffered a disc bulge compressing the thecal sac at the C4-5, C5-6, and L4-5 levels; (ii) MP suffered from a disc herniation compressing the thecal sac at the C3-4 and L3-4 levels; and (iii) the findings on MP's lumbar spine, which included a disc bulge and a disc herniation, were caused by MP's motor vehicle accident.

(xiv)   On May 22, 2018, an Insured named RC was involved in a minor automobile accident. In keeping with the fact that the accident was minor, RC was not seriously injured and was discharged from the hospital emergency room hours after arriving without being admitted to the hospital. To the extent that RC experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, not disc herniations. Even so, CareFirst and Desai submitted bills to GEICO for MRI scans purportedly performed on the lumbar spine and cervical spine of RC on June 28, 2018. In support of the bills, CareFirst and Desai included reports by Desai containing false and/or exaggerated "findings" to the effect that:  (i) RC suffered a disc bulge indenting the thecal sac at the C3-4, C4-5, C6-7, C7-T1, L3-4, L4-5, L5-S1 levels; (ii) RC suffered from a disc herniation at the L2-3 level; and (iii) the reported findings in RC's lumbar spine were caused by RC's motor vehicle accident.

(xv)   On May 29, 2018, an Insured named DB was involved in a minor automobile accident. In keeping with the fact that the accident was minor, DB was not seriously injured and did not seek treatment at a hospital emergency room. Instead, DB went to an urgent care center on the date of the accident. To the extent that DB experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, not disc herniations. Even so, Advanced Diagnostic, Johnson, and Desai submitted a bill to GEICO for an MRI scan purportedly performed on the cervical and lumbar spine of DB on July 30, 2018 at AD-Orlando 1. In support of the bill, Advanced Diagnostic, Johnson, and Desai included MRI reports by Desai containing false and/or exaggerated "findings" to the effect that:  (i) DB suffered a disc bulge compressing the thecal sac at the C2-3 and C4-5 levels; (ii) DB suffered a disc herniation compressing the thecal sac at the C3-4, C5-6, C6-7, and C7-T1 levels; and (iii) DB's lumbar spine included a disc bulge and a disc herniation at multiple levels, which were caused by DB's motor vehicle accident.

(xvi)   On June 17, 2018, an Insured named JD was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision. In keeping with the fact that JD was not seriously injured, JD visited the emergency room following the accident and was discharged hours after arriving without being admitted to the hospital. To the extent that JD experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, not disc herniations. Even so, Advanced Diagnostic, Johnson, and Desai submitted a bill to GEICO for MRI scans purportedly performed on the lumbar spine, thoracic spine, and cervical spine of JD on July 6, 2018 at AD-Tampa 1. In support of the bill, Advanced Diagnostic,

Johnson, and Desai included MRI reports by Desai containing false and/or exaggerated "findings" to the effect that: (i) JD suffered a disc bulge compressing the thecal sac at the C3-4, C4-5, C6-7, L1-2, L2-3, L3-4, and L4-5 levels; and (ii) JD suffered from a disc herniation compressing the thecal sac at the C5-6 and L5-S1 levels.

(xvii)  On June 28, 2018, an Insured named OS was involved in a minor automobile accident. In keeping with the fact that the accident was minor OS was not seriously injured and was discharged from the hospital emergency room hours after arriving without being admitted to the hospital. To the extent that OS experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, not disc herniations. Even so, CareFirst and Desai submitted bills to GEICO for MRI scans purportedly performed on the lumbar spine and cervical spine of OS on July 24, 2018. In support of the bills, CareFirst and Desai included reports by Desai containing false and/or exaggerated "findings" to the effect that: (i) OS suffered a disc bulge indenting the thecal sac at the C6-7, L2-3, and L3-4 levels; (ii) OS suffered a disc herniation at the C2-3, C3-4, C4-5, C5-6, T1-2, T2-3, T3-4, L1-2, L4-5, and L5-S1 levels; (iii) the disc herniation at the C2-3, T2-3, T3-4, and L1-2 levels were indenting the thecal sac; and (iv) the reported findings in OS's cervical spine and lumbar spine were caused by OS's motor vehicle accident.

(xviii)  On June 30, 2018, an Insured named AW was involved in a minor automobile accident. In keeping with the fact that the accident was minor, AW was not seriously injured and did not seek treatment at a hospital emergency room. Instead, AW went to a local medical office a few days after the accident. To the extent that AW experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, not disc herniations. Even so, CareFirst and Desai submitted two bills to GEICO for MRI scans purportedly performed on the lumbar spine and cervical spine of AW on September 24, 2018. In support of the bills, CareFirst and Desai included reports by Desai containing false and/or exaggerated "findings" to the effect that: (i) AW suffered a disc bulge indenting the thecal sac at the C5-6 and L4-5 levels; (ii) AW suffered from a disc herniation indenting the thecal sac at the C3-4, C4-5, C6-7 levels; and (iii) the reported findings in AW's cervical spine were caused by AW's motor vehicle accident.

(xix)  On July 10, 2018, an Insured named JG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that JG's vehicle was drivable following the accident, and that JG refused medical attention at the scene. In keeping with the fact that JG was not seriously injured, JG did not visit any hospital emergency room following the accident. To the extent that JG experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, not disc herniations. Even so, Advanced Diagnostic, Johnson, Desai, and Zimmelman submitted a bill to GEICO for an MRI scan purportedly performed on the lumbar spine of JG on July 14, 2018 at AD-Tampa 2. In support of the bill, Advanced

Diagnostic, Johnson, Desai, and Zimmelman included an MRI report by Desai containing false and/or exaggerated "findings" to the effect that: (i) JG suffered a disc bulge compressing the thecal sac at the L4-5 and L5-S1 levels; and (ii) the disc bulge compressing the thecal sac at the L4-5 level was caused by JG's motor vehicle accident.

(xx)    On July 19, 2018, an Insured named KM was involved in a minor automobile accident. In keeping with the fact that the accident was minor, KM was not seriously injured and was discharged from the hospital emergency room hours after arriving without being admitted to the hospital. To the extent that KM experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, not disc herniations. Even so, Advanced Diagnostic, Johnson, Martinez, and Desai purported to provide and submitted bills to GEICO for MRI scans purportedly performed on the lumbar spine and cervical spine of KM on July 31, 2019 at AD-Lakeland. In support of the bill, Advanced Diagnostic, Johnson, Martinez, and Desai included reports by Desai containing false and/or exaggerated "findings" to the effect that: (i) KM suffered a disc bulge compressing the thecal sac at the C4-5, C5-6, C6-7, L2-3, L3-4, and L4-5 levels; and (ii) KM suffered a disc herniation compressing the thecal sac at the C2-3, C3-4, L1-2, and L5-S1 level.

(xxi)   On July 25, 2018, an Insured named VP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that VP's vehicle was drivable following the accident, and that VP did not complain of any pain at the scene. In keeping with the fact that VP was not seriously injured, VP did not visit any hospital emergency room following the accident. To the extent that VP experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, not disc herniations. Even so, Advanced Diagnostic, Johnson, and Desai submitted a bill to GEICO for MRI scans purportedly performed on the cervical spine of VP on August 15, 2018 at AD-Brandon. In support of the bill, Advanced Diagnostic, Johnson, and Desai included an MRI report by Desai containing false and/or exaggerated "findings" to the effect that: (i) VP suffered a disc bulge compressing the thecal sac at the C3-4, C4-5, C5-6, and C6-7 levels; (ii) VP suffered from a disc herniation/protrusion compressing the thecal sac at the T2-3 level.

(xxii)  On August 4, 2018, an Insured named EC was involved in a minor automobile accident. In keeping with the fact that the accident was minor, EC was not seriously injured and was discharged from the hospital emergency room hours after arriving without being admitted to the hospital. To the extent that EC experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, not disc herniations. Even so, Advanced Diagnostic, Johnson, Zimmelman, and Desai purported to provide and submitted bills to GEICO for MRI scans purportedly performed on the lumbar spine and cervical spine of EC on September 6, 2018 at AD-Orlando 2. In support of the bill, Advanced Diagnostic, Johnson, Zimmelman, and Desai included reports by Desai containing false and/or exaggerated "findings" to the effect that: (i) EC suffered a disc bulge compressing

the thecal sac at the C3-4, L1-2, and L3-4 levels; and (ii) EC suffered disc herniations compressing the thecal sac at the at the C3-4, C4-5, C6-7, L2-3, L3-4, and L4-5 levels.

(xxiii)   On August 4, 2018, an Insured named JS was involved in a minor automobile accident. In keeping with the fact that the accident was minor, JS was not seriously injured and was discharged from the hospital emergency room hours after arriving without being admitted to the hospital. To the extent that JS experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, not disc herniations. Even so, Advanced Diagnostic, Johnson, Zimmelman, and Desai purported to provide and submitted bills to GEICO for MRI scans purportedly performed on the lumbar spine and cervical spine of JS on June 8, 2016 at AD-Orlando 2. In support of the bill, Advanced Diagnostic, Johnson, Zimmelman, and Desai included reports by Desai containing false and/or exaggerated "findings" to the effect that: (i) JS suffered a disc bulge compressing the thecal sac at the C6-7, C7-T1, L1-2, L2-3, and L5-S1 levels; and (ii) JS suffered a disc herniation compressing the thecal sac at the at the C2-3, C5-6, L3-4, and L4-5 levels.

(xxiv)   On September 23, 2018, an Insured named AM was involved in a minor automobile accident. In keeping with the fact that the accident was minor, AM was not seriously injured and did not seek treatment at a hospital emergency room. Instead, AM went to a local chiropractic office a few days after the accident. To the extent that AM experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, not disc herniations. Even so, CareFirst and Desai submitted bills to GEICO for MRI scans purportedly performed on the lumbar spine and cervical spine of AM on October 15, 2018. In support of the bills, CareFirst and Desai included reports by Desai containing false and/or exaggerated "findings" to the effect that: (i) AM suffered a disc bulge indenting the thecal sac at the C3-4, C4-5, L3-4, and L4-5 levels; (ii) AM suffered a disc herniation indenting the thecal sac at the C5-6 level; and (iii) the reported findings in AM's cervical spine were caused by AM's motor vehicle accident.

(xxv)   On October 12, 2018, an Insured named AF was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that AF's vehicle was drivable following the accident, and that AF did not complain of any pain at the scene. In keeping with the fact that AF was not seriously injured, AF did not visit any hospital emergency room following the accident. To the extent that AF experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before the Insured had failed a course of conservative treatment. Even so, Advanced Diagnostic, Johnson, Desai, and Zimmelman submitted a bill to GEICO for an MRI scan purportedly performed on the lumbar spine of AF on October 24, 2018 at AD-Tampa 2. In support of the bill, Advanced Diagnostic, Johnson, Desai, and Zimmelman included MRI reports by Desai containing false and/or exaggerated "findings" to the effect that: (i) AF suffered a disc bulge compressing the thecal sac at the C7-T1, L1-2, L2-3, L3-4, and L4-5 levels; and (ii)

a disc herniation compressing the thecal sac at the C3-4, C4-5, C5-6, C6-7, L5-S1 levels that was caused by AF's motor vehicle accident.

(xxvi)  On October 22, 2018, an Insured named GM was involved in a minor automobile accident. In keeping with the fact that the accident was minor GM was not seriously injured and was discharged from the hospital emergency room hours after arriving without being admitted to the hospital. To the extent that GM experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, not disc herniations. Even so, CareFirst and Desai submitted bills to GEICO for MRI scans purportedly performed on the lumbar spine and cervical spine of GM on January 29, 2019. In support of the bills, CareFirst and Desai included reports by Desai containing false and/or exaggerated "findings" to the effect that:  (i) GM suffered a disc bulge indenting the thecal sac at the C7-T1, L2-3, and L3-4 levels; (ii) GM suffered a disc herniation at the C3-4, C4-5, C5-6, C6-7, T1-2, T3-4, L4-5, and L5-S1 levels; (iii) the disc herniation at the C3-4, C6-7, T1-2, T3-4, L4-5 and L5-S1 levels were indenting the thecal sac; and (iv) the reported findings in GM's cervical spine and lumbar spine were caused by GM's motor vehicle accident.

(xxvii)  On November 27, 2018, an Insured named was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear end collision, and that AA's airbags were not deployed. In keeping with the fact that AA was not seriously injured, AA visited the emergency room following the accident and was discharged hours after arriving without being admitted to the hospital. To the extent that AA experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, not disc herniations. Even so, CareFirst and Desai submitted bills to GEICO for MRI scans purportedly performed on the lumbar spine and cervical spine of AA on January 23, 2019. In support of the bills, CareFirst and Desai included reports by Desai containing false and/or exaggerated "findings" to the effect that:  (i) AA suffered a disc bulge indenting the thecal sac at the C5-6, C6-7, L2-3, and L3-4 levels; (ii) AA suffered a disc herniation at the C3-4, C4-5, T1-2, T2-3, T9-10, T10-11, T11-12, L1-2, L3-4, and L4-5 levels; (iii) the disc herniation at the C3-4, T1-2, T2-3, T9-10, T10-11, L1-2, and L4-5 levels were indenting the thecal sac; and (iv) the reported findings in AA's cervical spine and lumbar spine were caused by AA's motor vehicle accident.

(xxviii)On March 29, 2019, an Insured named JD was involved in an automobile accident. In keeping with the fact that JD was not seriously injured, he sought treatment at a hospital emergency room immediately following the accident and the emergency room record indicated that JD had no evidence of traumatic injury. To the extent that JD experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, not disc herniations. Even so, Advanced Diagnostic, Johnson, Martinez, and Desai purported to provide and submitted bills to GEICO for MRI scans purportedly performed on the lumbar spine and cervical spine of JD on April 18, 2019 at AD-Lakeland. In support of the bill, Advanced Diagnostic, Johnson, Martinez, and Desai included reports by Desai

containing false and/or exaggerated "findings" to the effect that: (i) JD suffered a disc bulge compressing the thecal sac at the L2-3 level; (ii) JD suffered a disc herniation compressing the thecal sac at the C2-3, C3-4, C4-5, C5-6, C6-7, L3-4, L4-5, and L5-S1 levels; and (iii) it was "medically probable" that the disc herniations at the C2-3 and C5-6 levels were caused by JD's March 29, 2019 accident.

(xxix) On April 28, 2019, an Insured named SB was involved in an automobile accident. In keeping with the fact that the accident was minor SB  was not seriously injured and did not seek treatment at any hospital after the accident. Instead, SB first sought treatment at a local medical office the day after the accident. To the extent that SB experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, not disc herniations. Even so, Advanced Diagnostic, Johnson, Zimmelman, and Desai purported to provide and submitted bills to GEICO for MRI scans purportedly performed on the lumbar spine and cervical spine of SB on May 13, 2019 at AD-Palm Beach Gardens. In support of the bill, Advanced Diagnostic, Johnson, Zimmelman, and Desai included reports by Desai containing false and/or exaggerated "findings" to the effect that: (i) SB suffered a disc bulge compressing the thecal sac at the C6-7 and L4-5 levels; and (ii) SB suffered a disc herniation compressing the thecal sac at the at the C5-6 and L5-S1 levels.

(xxx) On May 26, 2019, an Insured named AM was involved in a minor automobile accident. In keeping with the fact that the accident was minor, AM did not complain of any injuries at the scene and did not seek treatment at any hospital after the accident. Instead, AM first sought treatment at a local medical office the same day. To the extent that AM experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, not disc herniations. Even so, Advanced Diagnostic, Johnson, Zimmelman, and Desai purported to provide and submitted bills to GEICO for an MRI scan purportedly performed on the lumbar spine of AM on June 8, 2019 at AD-Kissimmee. In support of the bill, Advanced Diagnostic, Johnson, Zimmelman, and Desai included reports by Desai containing false and/or exaggerated "findings" to the effect that: (i) AM suffered a disc bulge compressing the thecal sac at the L4-5 level; (ii) AM suffered a disc herniation compressing the thecal sac at the L5-S1 level; and (iii) that the reported disc herniation in AM's lumbar spine was caused by AM's May 26, 2019 accident.

(xxxi) On June 16, 2019, an Insured named DC was involved in a minor automobile accident. In keeping with the fact that the accident was minor, DC was not seriously injured and was not transported to a hospital emergency room after the accident. DC first sought treatment at a local medical office the following day. To the extent that DC experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, not disc herniations. Even so, Advanced Diagnostic, Johnson, Martinez, and Desai purported to provide and submitted bills to GEICO for MRI scans purportedly performed on the lumbar spine and cervical spine of DC on June 24, 2019 at AD-Lakeland. In support of the bill,

Advanced Diagnostic, Johnson, Martinez, and Desai included reports by Desai containing false and/or exaggerated "findings" to the effect that: (i) DC suffered a disc bulge compressing the thecal sac at the C3-4, C4-5, C5-6, L4-5, and L5-S1 levels; and (ii) DC suffered a disc herniation compressing the thecal sac at the C2-3 level.

(xxxii) On June 16, 2019, an Insured named KC was involved in a minor automobile accident. In keeping with the fact that the accident was minor, KC was not seriously injured and was not transported to a hospital emergency room after the accident. KC first sought treatment at a local medical office the following day. To the extent that KC experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs. Even so, Advanced Diagnostic, Johnson, Martinez, and Desai purported to provide and submitted bills to GEICO for MRI scans purportedly performed on the lumbar spine and cervical spine of KC on July 1, 2019 at AD-Lakeland. In support of the bill, Advanced Diagnostic, Johnson, Martinez, and Desai included reports by Desai containing false and/or exaggerated "findings" to the effect that KC suffered a disc bulge compressing the thecal sac at the C4-5, C5-6, L4-5, and L5-S1 levels.

(xxxiii) On September 23, 2019, an Insured named LC was involved in a minor automobile accident. In keeping with the fact that the accident was minor, LC was not seriously injured and only sought treatment at a hospital emergency room ten days after the accident where she was discharged hours after arriving without being admitted to the hospital. To the extent that LC experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, not disc herniations. Even so, CareFirst and Desai submitted bills to GEICO for MRI scans purportedly performed on the lumbar spine and cervical spine of LC on November 14, 2019. In support of the bills, CareFirst and Desai included reports by Desai containing false and/or exaggerated "findings" to the effect that: (i) LC suffered a disc bulge indenting the thecal sac at the C3-4, C4-5, and L3-4 levels; (ii) LC suffered a disc herniation indenting the thecal sac at the L4-5 and L5-S1 levels; and (iii) the reported findings in LC's lumbar spine were caused by LC's motor vehicle accident.

(xxxiv) On November 8, 2019, an Insured named GM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that the airbags in GM's vehicle did not deploy, and that GM's vehicle was drivable following the accident. In keeping with the fact that GM was not seriously injured, GM visited the emergency room following the accident and was discharged hours after arriving without being admitted to the hospital. To the extent that GM experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, not disc herniations. Even so, CareFirst and Desai submitted two bills to GEICO for MRI scans purportedly performed on the lumbar spine and cervical spine of GM on January 18, 2020. In support of the bills, CareFirst and Desai included reports by Desai containing false and/or exaggerated "findings" to the effect that: (i) GM suffered a disc herniation at the C2-3, C3-4, C4-5, C5-6, C6-7, L2-3, L3-4, L4-5,

and L5-S1 levels; (ii) the disc herniation at the C2-3, C3-4, C5-6, and L4-5 levels were indenting the thecal sac; and (iii) the reported findings in GM's cervical spine and lumbar spine were caused by GM's motor vehicle accident.

(xxxv) On January 18, 2020, an Insured named LV was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that LV's vehicle was drivable following the accident, and that LV did not complain of any injuries. In keeping with the fact that LV was not seriously injured, LV was not transported to a hospital emergency room. To the extent that LV experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, not disc herniations. Even so, CareFirst and Desai submitted bills to GEICO for MRI scans purportedly performed on the lumbar spine and cervical spine of LV on February 1, 2020. In support of the bills, CareFirst and Desai included reports by Desai containing false and/or exaggerated "findings" to the effect that: (i) LV suffered a disc bulge indenting the thecal sac at the C2-3, C6-7, and L5-S1 levels; (ii) LV suffered a disc herniation at the C3-4, C4-5, C7-T1, L2-3, L3-4, and L4-5 levels; (iii) the disc herniation at the L2-3, L3-4, and L4-5 levels were indenting the thecal sac; and (iv) the reported findings in LV's cervical spine and lumbar spine were caused by LV's motor vehicle accident.

101.    These are only representative samples. In the claims in Exhibits "1" and "2" that involved MRI scans of the Insureds' cervical spines and/or lumbar spines, Desai's reports routinely contained exaggerated and/or false interpretations, as well as clinically insignificant "findings", in order to create the false appearance that the Insureds had suffered serious injuries in their accidents, when in fact they had not.

102.    What is more, Desai routinely purported to conclude – in the MRI reports that the Defendants submitted to GEICO in support of their billing – that the Insureds not only suffered from disc bulges or disc herniations, but that the Insureds' putative disc bulges and herniations had somehow been caused by the Insureds' typically minor accidents.

103.    However, Desai worked almost exclusively as a "teleradiologist", who was not usually physically present at the Radiology Clinics' facilities. Instead, Desai almost always would work remotely, receive MRI images electronically from the Radiology Clinics, and then transmit his purported "interpretation" of the MRI images electronically back to the Radiology Clinics.

Accordingly, in the claims identified in Exhibits "1" and "2", Desai almost never personally examined or even met the Insureds.

104.    What is more, in the claims identified in Exhibits "1" and "2", when Desai purported to interpret the Insureds' MRIs, he almost never had any other significant medical records regarding the Insureds, such as examination reports, or the results of previous radiology studies or other diagnostic tests.

105.    Accordingly, Desai was not in a position to state whether the disc bulges or herniations he purported to identify in the Insureds were caused by the Insureds' typically minor automobile accidents.

106.    Even so, in the claims for the Fraudulent Services identified in Exhibits "1" and "2", Desai regularly included false conclusions that one or more of the Insureds' purported conditions was causally related to the Insureds' motor vehicle accidents without: (i) reviewing any prior diagnostic images; (ii) speaking with the Insureds; (iii) examining the Insureds; or (iv) reviewing any of the Insureds' prior medical records.

107.    For example:

(i)    On June 24, 2016, an Insured named KG was involved in an automobile accident. In keeping with the fact that the accident was minor, KG was not seriously injured and did not seek treatment at any hospital after the accident. Instead, KG first sought treatment at a local chiropractic office a few days after the accident. To the extent that KG experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs in the first place. Even so, Advanced Diagnostic, Johnson, and Desai submitted a bill to GEICO for a lumbar spine MRI purportedly performed on KG on July 19, 2016 at AD-Tampa 1. In support of the bill, Advanced Diagnostic, Johnson, and Desai submitted a report from Desai that falsely indicated "it is medically probable" the disc bulge at L5-S1 "was caused by the patient recent accident dated 06/24/2016". However, Desai provided this conclusion without: (i) interviewing or examining KG; (ii) reviewing any prior MRI scans or other radiology studies; or (iii) reviewing any of KG's prior medical records. In fact, it was impossible for Desai to legitimately conclude that KG's condition was caused by the motor vehicle accident.

(ii)     On June 28, 2016, an Insured named SS was involved in an automobile accident. In keeping with the fact that the accident was minor, SS did not seek treatment at any hospital after the accident. Instead, SS first sought treatment at a local medical office days after the accident.To the extent that SS experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs in the first place. Even so, Advanced Diagnostic, Johnson, Zimmelman, and Desai submitted a bill to GEICO for a lumbar spine MRI purportedly performed on SS on July 15, 2016 at AD-Palm Beach Gardens. In support of the bill, Advanced Diagnostic, Johnson, Zimmelman, and Desai submitted a report from Desai that falsely indicated "it is medically probable" the disc herniation at the L5-S1 level "was caused by the patient's recent accident dated 06/28/16." However, Desai provided this conclusion without: (i) interviewing or examining SS; (ii) reviewing any prior MRI scans or other radiology studies; or (iii) reviewing any of SS's prior medical records. In fact, it was impossible for Desai to legitimately conclude that SS's condition was caused by the motor vehicle accident.

(iii)    On November 8, 2017, an Insured named SD was involved in an automobile accident. In keeping with the fact that the accident was minor, SD was not seriously injured and did not seek treatment at any hospital after the accident. Instead, SD first sought treatment at a local chiropractic office a few days after the accident. Advanced Diagnostic, Johnson, and Desai submitted a bill to GEICO for, among other things, a cervical spine MRI purportedly performed on SD on December 22, 2017 at AD-Orlando 1. In support of the bill, Advanced Diagnostic, Johnson, and Desai submitted a report from Desai that falsely indicated "it is medically probable that the reported findings were caused by recent trauma/accident date 11/8/2017". However, Desai provided this conclusion without: (i) interviewing or examining SD; (ii) reviewing any prior MRI scans or other radiology studies; or (iii) reviewing any of SD's prior medical records. In fact, it was impossible for Desai to legitimately conclude that SD's conditions were caused by the motor vehicle accident.

(iv)    On December 8, 2017, an Insured named KB was involved in an automobile accident. In keeping with the fact that KB was not seriously injured, she sought treatment at a hospital emergency room after the accident and was discharged hours later without being admitted. To the extent that KB experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs in the first place. Even so, Advanced Diagnostic, Johnson, Zimmelman, and Desai submitted a bill to GEICO for a cervical spine MRI purportedly performed on KB on December 29, 2017at AD-Palm Beach Gardens. In support of the bill, Advanced Diagnostic, Johnson, Zimmelman, and Desai submitted a report from Desai that falsely indicated "it is medically probable that the reported findings were caused by recent trauma/accident date 12/7/2017". However, Desai provided this conclusion without: (i) interviewing or examining KB; (ii) reviewing any prior MRI scans or other radiology studies; or (iii) reviewing any of KB's prior medical records. In fact, it was impossible for Desai to

legitimately conclude that KB's condition was caused by the motor vehicle accident.

(v)     On January 19, 2018, an Insured named AT was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that AT's airbag was not deployed as a result of the accident, and that AT did not complain of any pain at the scene. In keeping with the fact that AT was not seriously injured, AT did not visit any hospital emergency room following the accident. To the extent that AT experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs in the first place. Even so, Advanced Diagnostic, Johnson, and Desai submitted a bill to GEICO for a cervical spine MRI purportedly performed on AT on February 27, 2018 at AD-Tampa 1. In support of the bill, Advanced Diagnostic submitted a report from Desai that falsely indicated "it is medically probable that the reported findings were caused by recent accident dated 01/19/2018". However, Desai provided this conclusion without: (i) interviewing or examining AT; (ii) reviewing any prior MRI scans or other radiology studies; or (iii) reviewing any of AT's prior medical records. In fact, it was impossible for Desai to legitimately conclude that AT's conditions were caused by the motor vehicle accident.

(vi)    On January 16, 2018, an Insured named LP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that LP's vehicle was drivable after the accident, and that LP did not complain of any pain at the scene. In keeping with the fact that LP was not seriously injured, LP did not visit any hospital emergency room following the accident. To the extent that LP experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs in the first place. Even so, Advanced Diagnostic, Johnson, and Desai submitted a bill to GEICO for a lumbar spine MRI purportedly performed on LP on February 28, 2018 at AD-Tampa 1. In support of the bill, Advanced Diagnostic, Johnson, and Desai submitted a report from Desai that falsely indicated "it is medically probable that the reported findings were caused by recent trauma/accident date 01/16/2018". However, Desai provided this conclusion without: (i) interviewing or examining LP; (ii) reviewing any prior MRI scans or other radiology studies; or (iii) reviewing any of LP's prior medical records. In fact, it was impossible for Desai to legitimately conclude that LP's conditions were caused by the motor vehicle accident.

(vii)   On March 29, 2018, an Insured named MB was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed and low-impact collision. In keeping with the fact that MB was not seriously injured, MB visited a hospital emergency room following the accident and was discharged hours later. To the extent that MB experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs in the first place. Even so, Advanced Diagnostic, Johnson, and Desai submitted a bill to GEICO for, among other things, a lumbar spine MRI purportedly performed on MB on April 20, 2018 at AD-Orlando 1. In support of the bill,

Advanced Diagnostic, Johnson, and Desai submitted a report from Desai that falsely indicated "it is medically probable" the disc herniations at L4-5 and L5-S1 were "caused by the patient recent accident dated 03/29/2018". However, Desai provided this conclusion without: (i) interviewing or examining MB; (ii) reviewing any prior MRI scans or other radiology studies; or (iii) reviewing any of MB's prior medical records. In fact, it was impossible for Desai to legitimately conclude that MB's conditions were caused by the motor vehicle accident.

(viii)    On April 10, 2018, an Insured named CE was involved in a minor automobile accident. In keeping with the fact that the accident was minor, CE did not visit any hospital emergency room after accident. Even so, Advanced Diagnostic, Johnson, and Desai submitted a bill to GEICO for, among other things, a lumbar spine MRI purportedly performed on CE on April 17, 2018 at AD-Brandon. In support of the bill, Advanced Diagnostic, Johnson, and Desai submitted a report from Desai that falsely indicated "it is medically probable" the disc herniations at L4-5 and L5-S1 were "caused by the patient recent accident dated 04/10/2018". However, Desai provided this conclusion without: (i) interviewing or examining CE; (ii) reviewing any prior MRI scans or other radiology studies; or (iii) reviewing any of CE's prior medical records. In fact, it was impossible for Desai to legitimately conclude that CE's conditions were caused by the motor vehicle accident.

(ix)    On April 20, 2018, an Insured named TS was involved in a minor automobile accident. In keeping with the fact that the accident was minor, TS was not seriously injured and was discharged from the hospital emergency room hours after arriving without being admitted to the hospital. To the extent TS experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs in the first place. Even so, Advanced Diagnostic, Johnson, and Desai submitted a bill to GEICO for a cervical spine MRI purportedly performed on TS on June 19, 2018 at AD-Tampa 1. In support of the bill, Advanced Diagnostic, Johnson, and Desai submitted a report from Desai that falsely indicated "it is medically probable" the disc herniation at C5-6 "was caused by the patient recent accident dated 04/22/2018". However, Desai provided this conclusion without: (i) interviewing or examining TS; (ii) reviewing any prior MRI scans or other radiology studies; or (iii) reviewing any of TS's prior medical records. In fact, it was impossible for Desai to legitimately conclude that TS's condition was caused by the motor vehicle accident.

(x)    On May 11, 2018, an Insured named KJ was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that the airbags in KJ's vehicle did not deploy. In keeping with the fact that KJ was not seriously injured, KJ visited the emergency room following the accident and was discharged hours after arriving without being admitted to the hospital. Even so, Advanced Diagnostic, Johnson, and Desai submitted a bill to GEICO for, among other things, a cervical spine MRI purportedly performed on KJ on June 5, 2018 at AD-Brandon. In support of the bill, Advanced Diagnostic, Johnson, and Desai submitted a report from Desai that falsely indicated "it is medically probable" the disc herniation at C4-5 "was caused

by the patient recent accident dated 05/11/2018". However, Desai provided this conclusion without: (i) interviewing or examining KJ; (ii) reviewing any prior MRI scans or other radiology studies; or (iii) reviewing any of KJ's prior medical records. In fact, it was impossible for Desai to legitimately conclude that KJ's condition was caused by the motor vehicle accident.

(xi)  On May 22, 2018, an Insured named MP was involved in a minor automobile accident. In keeping with the fact that the accident was minor, MP did not seek treatment at a hospital after the accident. Instead, she visited a chiropractor's office the following day. To the extent MP experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs in the first place. Even so, Advanced Diagnostic, Johnson, and Desai submitted a bill to GEICO for a lumbar spine MRI purportedly performed on MP on June 13, 2018 at AD-Orlando 1. In support of the bill, Advanced Diagnostic, Johnson, and Desai submitted a report from Desai that falsely indicated "it is medically probable that the reported findings were caused by recent trauma/accident date 05/22/2018". However, Desai provided this conclusion without: (i) interviewing or examining MP; (ii) reviewing any prior MRI scans or other radiology studies; or (iii) reviewing any of MP's prior medical records. In fact, it was impossible for Desai to legitimately conclude that MP's conditions were caused by the motor vehicle accident.

(xii)  On June 28, 2018, an Insured named OS was involved in a minor automobile accident. In keeping with the fact that the accident was minor, OS was not seriously injured and was discharged from the hospital emergency room hours after arriving without being admitted to the hospital. To the extent that OS experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs in the first place. Even so, CareFirst and Desai submitted two bills to GEICO for a cervical spine MRI and lumbar spine MRI purportedly performed on OS on July 24, 2018. In support of the bills, CareFirst and Desai submitted reports from Desai that falsely indicated "it is medically probable that reported findings were caused by recent trauma/accident date 6/27/2018". However, Desai provided these conclusions without: (i) interviewing or examining OS; (ii) reviewing any prior MRI scans or other radiology studies; or (iii) reviewing any of OS's prior medical records. In fact, it was impossible for Desai to legitimately conclude that OS's conditions were caused by the motor vehicle accident.

(xiii)  On June 30, 2018, an Insured named AW was involved in a minor automobile accident. In keeping with the fact that the accident was minor, AW was not seriously injured and did not seek treatment at a hospital emergency room. Instead, AW went to a local medical office a few days after the accident. To the extent that AW experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs in the first place. Even so, CareFirst and Desai submitted, among others, a bill to GEICO for a cervical spine MRI purportedly performed on AW on September 24, 2018. In support of the bill, CareFirst and Desai submitted a report from Desai that falsely indicated "it is

medically probable that reported findings were caused by recent trauma/accident date 8/1/2018". However, Desai provided these conclusions without: (i) interviewing or examining AW; (ii) reviewing any prior MRI scans or other radiology studies; or (iii) reviewing any of AW's prior medical records. In fact, it was impossible for Desai to legitimately conclude that AW's conditions were caused by the motor vehicle accident.

(xiv) On July 10, 2018, an Insured named JG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that JG's vehicle was drivable following the accident, and that JG refused medical attention at the scene. In keeping with the fact that JG was not seriously injured, JG did not visit any hospital emergency room following the accident. To the extent that JG experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs in the first place. Even so, Advanced Diagnostic, Johnson, Desai, and Zimmelman submitted a bill to GEICO for a lumbar spine MRI purportedly performed on JG on July 14, 2018 at AD-Tampa 2. In support of the bill, Advanced Diagnostic, Johnson, Desai, and Zimmelman submitted a report from Desai that falsely indicated "it is medically probable" the disc bulge at L4-5 "was caused by the patient recent accident dated 07/14/2018". However, Desai provided this conclusion without: (i) interviewing or examining JG; (ii) reviewing any prior MRI scans or other radiology studies; or (iii) reviewing any of JG's prior medical records. In fact, it was impossible for Desai to legitimately conclude that JG's condition was caused by the motor vehicle accident.

(xv) On August 16, 2018, an Insured named ES was involved in an automobile accident. In keeping with the fact that ES was involved in a minor automobile accident, ES was not seriously injured and did not seek any treatment at a hospital emergency room after the accident. Instead, ES sought treatment at a local medical office the next day. To the extent that ES experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs in the first place. Even so, Advanced Diagnostic, Johnson, Zimmelman, and Desai submitted a bill to GEICO for a cervical spine MRI purportedly performed on ES on August 25, 2018 at AD-Orlando 2. In support of the bill, Advanced Diagnostic, Johnson, Zimmelman, and Desai submitted a report from Desai that falsely indicated "it is medically probable that the reported findings were caused by recent trauma/accident date 08/16/2018". However, Desai provided this conclusion without: (i) interviewing or examining ES; (ii) reviewing any prior MRI scans or other radiology studies; or (iii) reviewing any of ES's prior medical records. In fact, it was impossible for Desai to legitimately conclude that ES's condition was caused by the motor vehicle accident.

(xvi) On September 23, 2018, an Insured named AM was involved in a minor automobile accident. In keeping with the fact that the accident was minor, AM was not seriously injured and did not seek treatment at a hospital emergency room. Instead, AM went to a local chiropractic office a few days after the accident. To the extent that AM experienced any health issues at all as the result of the accident, they were

minor soft tissue injuries that did not require MRIs in the first place. Even so, CareFirst and Desai submitted, among others, a bill to GEICO for a cervical spine MRI purportedly performed on AM on October 15, 2018. In support of the bill, CareFirst and Desai submitted a report from Desai that falsely indicated "it is medically probable that reported findings were caused by recent trauma/accident date 9/22/2018". However, Desai provided these conclusions without: (i) interviewing or examining AM; (ii) reviewing any prior MRI scans or other radiology studies; or (iii) reviewing any of AM's prior medical records. In fact, it was impossible for Desai to legitimately conclude that AM's conditions were caused by the motor vehicle accident.

(xvii)   On October 5, 2018, an Insured named KA was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that KA's vehicle was drivable after the accident, and that KA did not complain of any injuries. In keeping with the fact that KA was not seriously injured, KA was not transported to a hospital emergency room following the accident. To the extent that KA experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs in the first place. Even so, Advanced Diagnostic, Johnson, Zimmelman, and Desai submitted a bill to GEICO for a cervical spine MRI purportedly performed on KA on November 10, 2018 at AD-Kissimmee. In support of the bill, Advanced Diagnostic, Johnson, Zimmelman, and Desai submitted a report from Desai that falsely indicated "it is medically probable" the disc bulge at the C4-5 and C5-6 levels "was caused by the patient recent accident dated 10/05/2018." However, Desai provided this conclusion without: (i) interviewing or examining KA; (ii) reviewing any prior MRI scans or other radiology studies; or (iii) reviewing any of KA's prior medical records. In fact, it was impossible for Desai to legitimately conclude that KA's condition was caused by the motor vehicle accident.

(xviii)   On October 22, 2018, an Insured named GM was involved in a minor automobile accident. In keeping with the fact that the accident was minor GM was not seriously injured and was discharged from the hospital emergency room hours after arriving without being admitted to the hospital. To the extent that GM experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs in the first place. Even so, CareFirst and Desai submitted two bills to GEICO for a cervical spine MRI and lumbar spine MRI purportedly performed on GM on February 1, 2020. In support of the bills, CareFirst and Desai submitted reports from Desai that falsely indicated "it is medically probable that reported findings were caused by recent trauma/accident date 10/22/2018". However, Desai provided these conclusions without: (i) interviewing or examining GM; (ii) reviewing any prior MRI scans or other radiology studies; or (iii) reviewing any of GM's prior medical records. In fact, it was impossible for Desai to legitimately conclude that GM's conditions were caused by the motor vehicle accident.

(xix)   On November 21, 2018, an Insured named EM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-

speed, low-impact collision, and that EM refused medical attention at the scene. In keeping with the fact EM was not seriously injured, EM did not visit any hospital emergency room following the accident. To the extent that EM experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs in the first place. Even so, CareFirst and Desai submitted, among others, a bill to GEICO for a cervical spine MRI purportedly performed on EM on January 31, 2019. In support of the bill, CareFirst and Desai submitted a report from Desai that falsely indicated "it is medically probable that reported findings were caused by recent trauma/accident date 11/21/2018". However, Desai provided these conclusions without: (i) interviewing or examining EM; (ii) reviewing any prior MRI scans or other radiology studies; or (iii) reviewing any of EM's prior medical records. In fact, it was impossible for Desai to legitimately conclude that EM's conditions were caused by the motor vehicle accident.

(xx)     On February 8, 2019, an Insured named SM was involved in a minor automobile accident. In keeping with the fact that the accident was minor, SM was not seriously injured and did not seek treatment at a hospital emergency room after the accident. Instead, SM sought treatment at a local chiropractic office ten days after the accident. To the extent SM experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs in the first place. Even so, Advanced Diagnostic, Johnson, Desai, and Zimmelman submitted a bill to GEICO for a lumbar spine MRI purportedly performed on SM on March 5, 2019 at AD-Tampa 2. In support of the bill, Advanced Diagnostic, Johnson, Desai, and Zimmelman submitted a report from Desai that falsely indicated "it is medically probable" the disc herniation at L3-4 and L4-5 "was caused by the patient recent accident dated 02/08/2019". However, Desai provided this conclusion without: (i) interviewing or examining SM; (ii) reviewing any prior MRI scans or other radiology studies; or (iii) reviewing any of SM's prior medical records. In fact, it was impossible for Desai to legitimately conclude that SM's condition was caused by the motor vehicle accident.

(xxi)    On March 29, 2019, an Insured named JD was involved in an automobile accident. In keeping with the fact that JD was not seriously injured, he sought treatment at a hospital emergency room immediately following the accident and the emergency room record indicated that JD had no evidence of traumatic injury. To the extent that JD experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs in the first place. Even so, Advanced Diagnostic, Johnson, Martinez, and Desai submitted a bill to GEICO for a cervical spine MRI purportedly performed on JD on April 18, 2019 at AD-Lakeland. In support of the bill, Advanced Diagnostic, Johnson, Martinez, and Desai submitted a report from Desai that falsely indicated "it is medically probable" the disc herniations at C2-3 and C5-6 "was caused by the patient recent accident dated 03/29/2018." However, Desai provided this conclusion without: (i) interviewing or examining JD; (ii) reviewing any prior MRI scans or other radiology studies; or (iii) reviewing any of JD's prior medical records. In fact, it was impossible for Desai to legitimately conclude that JD's condition was caused by the motor vehicle accident.

(xxii)   On April 14, 2019, an Insured named FJ was involved in a minor automobile accident. In keeping with the fact that the accident was minor FJ was not seriously injured and did not seek treatment at a hospital emergency room immediately after the accident. Instead, FJ sought treatment at a local medical office days after the accident. To the extent that FJ experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs in the first place. Even so, CareFirst and Desai submitted two bills to GEICO for a cervical spine MRI and lumbar spine MRI purportedly performed on FJ on June 11, 2019. In support of the bills, CareFirst and Desai submitted reports from Desai that falsely indicated "it is medically probable" the disc herniations in the lumbar spine and cervical spine "were caused by recent trauma/accident date 04/14/2019". However, Desai provided these conclusions without: (i) interviewing or examining FJ; (ii) reviewing any prior MRI scans or other radiology studies; or (iii) reviewing any of FJ's prior medical records. In fact, it was impossible for Desai to legitimately conclude that FJ's conditions were caused by the motor vehicle accident.

(xxiii)   On May 26, 2019, an Insured named AM was involved in a minor automobile accident. In keeping with the fact that the accident was minor, AM did not complain of any injuries at the scene and did not seek treatment at any hospital after the accident. Instead, AM first sought treatment at a local medical office the same day. To the extent that AM experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs in the first place. Even so, Advanced Diagnostic, Johnson, Zimmelman, and Desai submitted a bill to GEICO for a lumbar spine MRI purportedly performed on AM on June 8, 2019 at AD-Kissimmee. In support of the bill, Advanced Diagnostic, Johnson, Zimmelman, and Desai submitted a report from Desai that falsely indicated "it is medically probable" the disc herniation at the L5-S1 level "was caused by the patient recent accident dated 05/26/2019." However, Desai provided this conclusion without: (i) interviewing or examining AM; (ii) reviewing any prior MRI scans or other radiology studies; or (iii) reviewing any of AM's prior medical records. In fact, it was impossible for Desai to legitimately conclude that AM's condition was caused by the motor vehicle accident.

(xxiv)   On August 16, 2019, an Insured named AS was involved in an automobile accident. In keeping with the fact that the accident was minor, AS was not seriously injured and was discharged from a hospital emergency room hours after arriving. To the extent that AS experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs in the first place. Even so, Advanced Diagnostic, Johnson, Martinez, and Desai submitted a bill to GEICO for a lumbar spine MRI purportedly performed on JD on September 4, 2019 at AD-Lakeland. In support of the bill, Advanced Diagnostic, Johnson, Martinez, and Desai submitted a report from Desai that falsely indicated "it is medically probable" the disc bulges at L4-5 and L5-S1 "was caused by the patient recent accident dated 08/16/2019." However, Desai provided this conclusion without: (i) interviewing or examining AS; (ii) reviewing any prior MRI scans or other radiology studies; or (iii) reviewing any of AS's prior medical records. In fact, it was impossible for

Desai to legitimately conclude that AS's condition was caused by the motor vehicle accident.

(xxv)  On September 23, 2019, an Insured named LC was involved in a minor automobile accident. In keeping with the fact that the accident was minor LC was not seriously injured and only sought treatment at a hospital emergency room ten days after the accident where she was discharged hours after arriving without being admitted to the hospital. To the extent that LC experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs in the first place. Even so, CareFirst and Desai submitted, among others, a bill to GEICO for a lumbar spine MRI purportedly performed on LC on November 14, 2019. In support of the bill, CareFirst and Desai submitted a report from Desai that falsely indicated "it is medically probable that reported disc herniation were caused by recent trauma/accident date 9.23.2019". However, Desai provided these conclusions without: (i) interviewing or examining LC; (ii) reviewing any prior MRI scans or other radiology studies; or (iii) reviewing any of LC's prior medical records. In fact, it was impossible for Desai to legitimately conclude that LC's conditions were caused by the motor vehicle accident.

(xxvi)  On November 8, 2019, an Insured named GM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that the airbags in GM's vehicle did not deploy, and that GM's vehicle was drivable following the accident. In keeping with the fact that GM was not seriously injured, GM visited the emergency room following the accident and was discharged hours after arriving without being admitted to the hospital. To the extent that GM experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs in the first place. Even so, CareFirst and Desai submitted two bills to GEICO for a cervical spine MRI and lumbar spine MRI purportedly performed on GM on January 18, 2020. In support of the bills, CareFirst and Desai submitted reports from Desai that falsely indicated "it is medically probable" the disc herniations in the lumbar spine and cervical spine "were caused by recent trauma/accident date 11/08/19". However, Desai provided these conclusions without: (i) interviewing or examining GM; (ii) reviewing any prior MRI scans or other radiology studies; or (iii) reviewing any of GM's prior medical records. In fact, it was impossible for Desai to legitimately conclude that GM's conditions were caused by the motor vehicle accident.

(xxvii)  On December 4, 2019, an Insured named DL was involved in a minor automobile accident. In keeping with the fact that the accident was minor, DL was not seriously injured and did not visit any hospital emergency room after accident. To the extent that DL experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs in the first place. Even so, CareFirst and Desai submitted two bills to GEICO for a thoracic spine MRI and lumbar spine MRI purportedly performed on DL on February 16, 2019. In support of the bills, CareFirst and Desai submitted reports from Desai that falsely indicated "it is medically probable" the disc herniations in the lumbar and thoracic spine

"were caused by recent trauma/accident date 12/4/2019". However, Desai provided these conclusions without: (i) interviewing or examining DL; (ii) reviewing any prior MRI scans or other radiology studies; or (iii) reviewing any of DL's prior medical records. In fact, it was impossible for Desai to legitimately conclude that DL's conditions were caused by the motor vehicle accident.

(xxviii) On January 2, 2020, an Insured named TW was involved in an automobile accident. In keeping with the fact that the accident was minor, TW was not seriously injured and did not seek treatment at a hospital emergency room after the accident. To the extent that TW experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs in the first place. Even so, Advanced Diagnostic, Johnson, Martinez, and Desai submitted a bill to GEICO for a lumbar spine MRI purportedly performed on TW on January 22, 2020 at AD-Lakeland. In support of the bill, Advanced Diagnostic, Johnson, Martinez, and Desai submitted a report from Desai that falsely indicated "it is medically probable" the herniated discs at L4-5 and L5-S1 "are related to injuries sustained from the patient's accident of 1/2/2020". However, Desai provided this conclusion without: (i) interviewing or examining TW; (ii) reviewing any prior MRI scans or other radiology studies; or (iii) reviewing any of TW's prior medical records. In fact, it was impossible for Desai to legitimately conclude that TW s condition was caused by the motor vehicle accident.

(xxix) On January 18, 2020, an Insured named LV was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that LV's vehicle was drivable following the accident, and that LV did not complain of any injuries. In keeping with the fact that LV was not seriously injured, LV was not transported to a hospital emergency room. To the extent that LV experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs in the first place. Even so, CareFirst and Desai submitted two bills to GEICO for a cervical spine MRI and lumbar spine MRI purportedly performed on LV on February 1, 2020. In support of the bills, CareFirst and Desai submitted reports from Desai that falsely indicated "it is medically probable" the disc herniations in the lumbar spine and cervical spine "were caused by recent trauma/accident date 1/18/2020". However, Desai provided these conclusions without: (i) interviewing or examining LV; (ii) reviewing any prior MRI scans or other radiology studies; or (iii) reviewing any of LV's prior medical records. In fact, it was impossible for Desai to legitimately conclude that LV's conditions were caused by the motor vehicle accident.

108. In actuality, and as set forth above, the Insureds' typically minor accidents could not possibly have caused them to suffer bulging or herniated discs at the rate identified by Desai.

109. In the claims identified in Exhibits "1" and "2", the Defendants routinely falsely represented that the Insureds' purported disc bulges and herniations were caused by their (typically

minor) accidents in order to create a false justification for their own medically unnecessary MRIs, and to create a false justification for their referral sources to bill for extensive, medically unnecessary treatment.

## C.    The Illusory MRI Interpretations

110.    Upon information and belief as set forth below, another reason why the Defendants' MRI reports routinely contained false and/or exaggerated "findings" was because Desai never legitimately interpreted the MRIs in the first instance.

111.    In a legitimate clinical setting, it is improbable that a radiologist routinely would be able to properly read and interpret more than 60-70 MRIs and other radiological images per day.

112.    It is even more improbable – to the point of impossibility – that a radiologist routinely would be able to properly read and interpret more than 100 MRIs and other radiological images per day.

113.    Even so, GEICO routinely received billing from Advanced Diagnostic, CareFirst, and other radiology providers where Desai purported to work, which represented that Desai had interpreted at least 60 MRIs and other radiological images for GEICO Insureds, alone, on individual dates of service.

114.    For example:

(i)      On April 29, 2015, Desai purported to interpret at least 61 MRIs and other radiological images for GEICO Insureds purportedly taken at multiple radiology facilities, including: (a) the Advanced Diagnostic Clinics; (b) Path Medical; and (c) MRI Associates of Tampa.

(ii)     On November 26, 2016, Desai purported to interpret at least 63 MRIs and other radiological images for GEICO Insureds purportedly taken at multiple radiology facilities, including: (a) the Advanced Diagnostic Clinics; (b) Path Medical; and (c) CareFirst.

(iii)    On June 16, 2017, Desai purported to interpret at least 63 MRIs and other radiological images for GEICO Insureds purportedly taken at multiple radiology facilities, including: (a) the Advanced Diagnostic Clinics; (b) Path Medical; (c) CareFirst; and (d) Saint Pete MRI.

(iv)    On September 1, 2017, Desai purported to interpret at least 70 MRIs and other radiological images for GEICO Insureds purportedly taken at multiple radiology facilities, including: (a) the Advanced Diagnostic Clinics; (b) Path Medical; and (c) Saint Pete MRI.

(v)    On September 27, 2017, Desai purported to interpret at least 70 MRIs and other radiological images for GEICO Insureds purportedly taken at multiple radiology facilities, including: (a) the Advanced Diagnostic Clinics; (b) Path Medical; (c) CareFirst; and (d) Saint Pete MRI.

(vi)    On October 23, 2017, Desai purported to interpret at least 69 MRIs and other radiological images for GEICO Insureds purportedly taken at multiple radiology facilities, including: (a) the Advanced Diagnostic Clinics; and (b) Path Medical.

(vii)    On November 29, 2017, Desai purported to interpret at least 63 MRIs and other radiological images for GEICO Insureds purportedly taken at multiple radiology facilities, including: (a) the Advanced Diagnostic Clinics; (b) Path Medical; and (c) CareFirst.

(viii)    On December 27, 2017, Desai purported to interpret at least 64 MRIs and other radiological images for GEICO Insureds purportedly taken at multiple radiology facilities, including: (a) the Advanced Diagnostic Clinics; (b) Path Medical; and (c) CareFirst.

(ix)    On February 22, 2018, Desai purported to interpret at least 63 MRIs and other radiological images for GEICO Insureds purportedly taken at multiple radiology facilities, including: (a) the Advanced Diagnostic Clinics; (b) Path Medical; (c) CareFirst; and (d) Saint Pete MRI.

(x)    On March 9, 2018, Desai purported to interpret at least 74 MRIs and other radiological images for GEICO Insureds purportedly taken at multiple radiology facilities, including: (a) the Advanced Diagnostic Clinics; (b) Path Medical; (c) CareFirst; and (d) Saint Pete MRI.

(xi)    On March 30, 2018, Desai purported to interpret at least 63 MRIs and other radiological images for GEICO Insureds purportedly taken at multiple radiology facilities, including: (a) the Advanced Diagnostic Clinics; (b) Path Medical; (c) CareFirst; and (d) Saint Pete MRI.

(xii)    On March 5, 2019, Desai purported to interpret at least 65 MRIs and other radiological images for GEICO Insureds purportedly taken at multiple radiology facilities, including: (a) the Advanced Diagnostic Clinics; (b) Path Medical; and (c) CareFirst.

(xiii)   On September 24, 2019, Desai purported to interpret at least 76 MRIs and other radiological images for GEICO Insureds purportedly taken at multiple radiology facilities, including: (a) the Advanced Diagnostic Clinics; (b) Path Medical; (c) Rose Radiology Centers; and (d) CareFirst.

(xiv)   On October 16, 2019, Desai purported to interpret at least 69 MRIs and other radiological images for GEICO Insureds purportedly taken at multiple radiology facilities, including: (a) the Advanced Diagnostic Clinics; (b) Path Medical; (c) CareFirst; and (d) Saint Pete MRI.

(xv)   On January 6, 2020, Desai purported to interpret at least 66 MRIs and other radiological images for GEICO Insureds purportedly taken at multiple radiology facilities, including: (a) the Advanced Diagnostic Clinics; (b) Path Medical; and (c) CareFirst.

115.   Upon information and belief, the billing for MRIs and other radiological interpretations purportedly performed by Desai that the Defendants submitted through Advanced Diagnostic and CareFirst to GEICO constituted only a fraction of the total billing for MRIs and other radiological interpretations purportedly performed by Desai that the Defendants submitted through Advanced Diagnostic and CareFirst to all of the automobile insurers in the automobile insurance markets where Desai purported to work.

116.   For example, GEICO is only one of the automobile insurance companies doing business in the Florida automobile insurance market.

117.   It is extremely improbable, to the point of impossibility, that the Defendants only submitted billing to GEICO for Desai's work, and that the Defendants did not simultaneously bill other automobile insurers for Desai's work.

118.   Thus, upon information and belief, the improbable number of MRIs and other radiological images that Desai purported to interpret for GEICO's Florida Insureds on individual dates of service, including the dates of service identified above, constituted only a fraction of the total, and impossible, number of MRIs and radiological images that Desai purported to interpret on individual dates, including to individuals insured by companies other than GEICO.

119.    In fact – upon information and belief as set forth herein – the reason why Desai was able to "interpret" such a massive number of MRIs and other images on individual dates of service was because he was not legitimately interpreting the MRIs in the first instance. Instead, the purported "results" of the MRIs were pre-determined and phony, in order to create the false appearance that the Insureds had suffered serious injuries in their accidents, when in fact they had not.

**D**.    **The Violations of the Clinic Act**

**1.**    **The Operation of the Advanced Diagnostic Clinics in Violation of the Clinic Act**

120.    Since at least 2015, Johnson has owned and controlled Advanced Diagnostic, including all of the Advanced Diagnostic Clinics.

121.    As set forth above, Johnson sought to use Advanced Diagnostic as a vehicle to submit a large volume of fraudulent PIP billing to GEICO and other insurers, including the billing for all of the Fraudulent Services set forth in Exhibit "1".

122.    However, because the Advanced Diagnostic Clinics were subject to the Clinic Act, Johnson could not lawfully operate the Advanced Diagnostic Clinics, or use Advanced Diagnostic as a vehicle to submit PIP billing to GEICO and other insurers, unless he recruited and retained licensed physicians to serve as medical directors at the Advanced Diagnostic Clinics. See Fla. Stat. §§ 400.9905, 440.9935.

123.    However, if Johnson recruited and retained legitimate physicians to serve as legitimate medical directors at each of the Advanced Diagnostic Clinics, the physicians actually would be obligated to fulfill the statutory requirements applicable to clinic medical directors. See, e.g., Fla. Stat. § 400.9935(1).  By extension, any such legitimate medical directors would impede Johnson's ability to use Advanced Diagnostic as a vehicle to submit a large amount of fraudulent PIP billing to GEICO and other Florida automobile insurers.

124.     Accordingly, Johnson required pliable physicians willing to falsely pose as the "medical directors" at each of the Advanced Diagnostic Clinics, but who – in actuality – would not even attempt to fulfill the statutory requirements applicable to clinic medical directors, and thereby permit Johnson to use each of the Advanced Diagnostic Clinics as a vehicle to submit a large amount of fraudulent PIP billing to GEICO and other insurers.

125.     Therefore, Johnson recruited and retained Zimmelman to falsely pose as the legitimate medical director of AD-Tampa 2, AD-Palm Beach Gardens, AD-Kissimmee, and AD-Orlando.

126.     Johnson recruited and retained Martinez to falsely pose as the legitimate medical director of AD-Lakeland.

127.     Johnson recruited Desai to falsely pose as the legitimate medical director of AD-Tampa-1, AD-Orlando-1, and AD-Brandon.

128.     In order to circumvent Florida law and induce the Florida Agency for Health Care Administration to provide a license and to permit each of the Advanced Diagnostic Clinics to operate as a clinic, Johnson and Advanced Diagnostic entered into secret schemes with Desai, Martinez, and Zimmelman. In exchange for compensation from Johnson and Advanced Diagnostic, Desai, Martinez, and Zimmelman each agreed to falsely represent to the Florida Agency for Health Care Administration, to the Insureds who sought treatment at Advanced Diagnostic, and to the insurers including GEICO that received PIP claims from Advanced Diagnostic, that they were the true medical directors of the Advanced Diagnostic Clinics, and that they truly fulfilled the statutory requirements applicable to clinic medical directors at the Advanced Diagnostic Clinics.

129.    However, Desai, Martinez, and Zimmelman never served as genuine medical directors at any of the Advanced Diagnostic Clinics. Instead, from the beginning of their association with the Advanced Diagnostic Clinics as phony medical directors, Desai, Martinez, and Zimmelman ceded all day-to-day decision-making and oversight regarding healthcare services at their respective clinics, and the resulting billing, to Johnson.

130.    In light of the fraudulent treatment and billing protocols described herein, Desai, Martinez, and Zimmelman did not, and could not have, "[c]onduct[ed] systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful." See Fla. Stat. § 400.9935(1).

131.    Had Desai, Martinez, and Zimmelman actually fulfilled their statutory roles as medical directors for the Advanced Diagnostic Clinics, they would have noticed the fraudulent treatment and billing protocols described herein and taken corrective action.

132.    Desai, Martinez, and Zimmelman failed to take any corrective action because they never actually served as legitimate medical directors at the Advanced Diagnostic Clinics in the first instance.

133.    Rather, true authority over the provision of healthcare services through each of the Advanced Diagnostic Clinics, and the resulting billing – including the authority that would, at a legitimate clinic, be vested in the medical director of each clinic – was held at all times by Johnson.

134.    Johnson used the façade of Desai, Martinez, and Zimmerman's phony appointments as the Advanced Diagnostic Clinics' ersatz "medical directors" to do indirectly what he was forbidden from doing directly – namely: (i) to operate each clinic without a legitimate medical director; and (ii) to use each of the Advanced Diagnostic Clinics as a vehicle to submit a massive amount of fraudulent PIP billing to GEICO and other insurers.

2.      **The Operation of CareFirst in Violation of the Clinic Act**

135.    Similarly, in violation of the Clinic Act, Desai did not – and could not have – legitimately supervised the business activities of CareFirst, inasmuch as Desai never conducted reviews of the billing or treatment records from CareFirst to ensure that the billing was not fraudulent or unlawful, and in fact caused the submission of the fraudulent and unlawful charges through CareFirst.

136.    In light of the fraudulent treatment and billing protocol described herein – including medically unnecessary MRIs, false or exaggerated MRI "findings", and billing for an impossible number of MRIs provided on individual dates – there is no way Desai legitimately could have supervised the business activities of CareFirst.

137.    What is more, in light of his superhumanly-crowded schedule, which not only included the purported performance of an impossible number of MRI interpretations on individual dates, but also his ersatz service as the phony "medical director" at at least three Advanced Diagnostic Clinics – in addition to other Florida healthcare clinics – there is no way Desai legitimately could have supervised the business activities of CareFirst.

138.    Accordingly, Care First never qualified for the exemption from licensure as a "health care clinic" set forth in Section 400.9905(4)(g). Nor did CareFirst have a medical director as required for a health care clinic without an exemption. As a result, CareFirst operated – at all relevant times – in violation of the Clinic Act.

III.    <u>**The Fraudulent Claims the Defendants Submitted or Caused to be Submitted to GEICO**</u>

139.    To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted thousands of HCFA-1500 forms and diagnostic imaging reports through Advanced Diagnostic and CareFirst to GEICO, containing thousands of individual charges,

seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

140.     The claims that Advanced Diagnostic, Johnson, Desai, Martinez, and Zimmelman submitted or caused to be submitted through Advanced Diagnostic to GEICO were false and misleading in the following, material respects:

(i)     The HCFA-1500 forms and diagnostic imaging reports submitted or caused to be submitted by Advanced Diagnostic, Johnson, Desai, Martinez, and Zimmelman through Advanced Diagnostic uniformly misrepresented to GEICO that the Advanced Diagnostic Clinics were in compliance with the Clinic Act and eligible to collect PIP Benefits in the first instance. In fact, the Advanced Diagnostic Clinics never were in compliance with the Clinic Act, and Advanced Diagnostic was never eligible to collect PIP Benefits, because the Advanced Diagnostic Clinics operated without legitimate medical directors who legitimately fulfilled the statutory requirements applicable to clinic medical directors.

(ii)    The HCFA-1500 forms and diagnostic imaging reports submitted or caused to be submitted by Advanced Diagnostic, Johnson, Desai, Martinez, and Zimmelman through Advanced Diagnostic uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary and, in many cases, misrepresented to GEICO that the Fraudulent Services actually were performed. In fact, the Fraudulent Services were not medically necessary, and were not legitimately performed, as they were not clinically appropriate and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich Johnson, Desai, Martinez, Zimmelman, Advanced Diagnostic, and their referral sources, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

141.     The claims that CareFirst Desai submitted or caused to be submitted through CareFirst to GEICO were false and misleading in the following, material respects:

(i)     The HCFA-1500 forms and diagnostic imaging reports submitted or caused to be submitted by CareFirst and Desai through CareFirst uniformly misrepresented to GEICO that CareFirst was in compliance with the Clinic Act and eligible to collect PIP Benefits in the first instance. In fact, CareFirst never was in compliance with the Clinic Act, and CareFirst was never eligible to collect PIP Benefits, because CareFirst failed to qualify for the "wholly owned" exemption to the Clinic Act, and otherwise lacked a clinic license and a legitimate medical director.

(ii)    The HCFA-1500 forms and diagnostic imaging reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the

Fraudulent Services were medically necessary and, in many cases, misrepresented to GEICO that the Fraudulent Services actually were performed. In fact, the Fraudulent Services were not medically necessary, and were not legitimately performed, as they were not clinically appropriate and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich Desai, CareFirst, and their referral sources, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

## IV.  The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

142.   The Defendants were legally and ethically obligated to act honestly and with integrity in connection with their performance of the Fraudulent Services and their submission of charges to GEICO.

143.   To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants have systemically concealed their fraud and have gone to great lengths to accomplish this concealment.

144.   For instance, the Defendants knowingly misrepresented and concealed facts related to Advanced Diagnostic and CareFirst in an effort to prevent discovery that the Radiology Clinics were operated in violation of the Clinic Act, and therefore were ineligible to collect PIP Benefits in the first instance.

145.   What is more, the Defendants knowingly misrepresented and concealed facts related to the Fraudulent Services in an effort to prevent discovery that the Fraudulent Services were being provided at the Radiology Clinics – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed to maximize the charges that could be submitted, not to benefit the Insureds who supposedly were subjected to them.

146.   Moreover, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services frequently never were legitimately performed in the first instance.

147. The Defendants have hired law firms to pursue collection of the fraudulent charges for the Fraudulent Services from GEICO and other insurers. These law firms routinely file expensive and time-consuming litigation against GEICO and other insurers if the charges are not promptly paid in full.

148. GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially-valid documents submitted to GEICO in keeping with the fraudulent charges at issue, combined with the material misrepresentations and acts of concealment described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred damages of more than $23,000,000.00.

149. Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

### FIRST CAUSE OF ACTION
**Against Advanced Diagnostic and CareFirst**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

150. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-149 above.

151. There is an actual case in controversy between GEICO and both Advanced Diagnostic and CareFirst regarding more than $75,000.00 in pending fraudulent claims for the Fraudulent Services that have been submitted to GEICO.

152. Advanced Diagnostic and CareFirst have no right to receive payment for any pending bills submitted to GEICO because Advanced Diagnostic and CareFirst unlawfully operated in violation of the Clinic Act's medical director and licensing requirements.

153. Advanced Diagnostic and CareFirst have no right to receive payment for any

pending bills submitted to GEICO because the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants and others, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

154.    Advanced Diagnostic and CareFirst have no right to receive payment for any pending bills submitted to GEICO because, in many cases, the Fraudulent Services never were legitimately provided in the first instance.

155.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Advanced Diagnostic and CareFirst have no right to receive payment for any pending bills submitted to GEICO.

**SECOND CAUSE OF ACTION**
**Against Johnson**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

156.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-149 above.

157.    Advanced Diagnostic is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

158.    Johnson knowingly has conducted and/or participated, directly or indirectly, in the conduct of Advanced Diagnostic's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over three years seeking payments that Advanced Diagnostic was not eligible to receive under the No-Fault Law because: (i) the Advanced Diagnostic Clinics unlawfully operated in violation of the Clinic Act's medical director and licensing requirements; (ii) the

underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants and others, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; and (iii) in many cases, the Fraudulent Services never were legitimately provided in the first instance.

159.   A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

160.   Advanced Diagnostic's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Johnson operated Advanced Diagnostic, inasmuch as Advanced Diagnostic was not engaged in a legitimate healthcare practice, and acts of mail fraud therefore were essential in order for Advanced Diagnostic to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Advanced Diagnostic continues to attempt collection on the fraudulent billing submitted through Advanced Diagnostic to the present day.

161.   Advanced Diagnostic is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Advanced Diagnostic in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

162.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $21,200,000.00 pursuant to the fraudulent bills submitted through the Advanced Diagnostic enterprise.

163.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**THIRD CAUSE OF ACTION**
**Against Johnson, Desai, Martinez, and Zimmelman**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

164.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-149 above.

165.    Advanced Diagnostic is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

166.    Johnson, Desai, Martinez, and Zimmelman are employed by or associated with the Advanced Diagnostic enterprise.

167.    Johnson, Desai, Martinez, and Zimmelman knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Advanced Diagnostic's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over three years seeking payments that Advanced Diagnostic was not eligible to receive under the No-Fault Law because: (i) the Advanced Diagnostic Clinics unlawfully operated in violation of the Clinic Act's medical director and licensing requirements; (ii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all –

pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants and others, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; and (iii) in many cases, the Fraudulent Services never were legitimately provided in the first instance.

168.     A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

169.     Johnson, Desai, Martinez, and Zimmelman knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

170.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $21,200,000.00 pursuant to the fraudulent bills submitted through the Advanced Diagnostic enterprise.

171.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## FOURTH CAUSE OF ACTION
### Against Advanced Diagnostic, Johnson, Desai, Martinez, and Zimmelman
### (Under Fla. Stat. 501.201 et. seq.)

172.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-149 above.

173.    Advanced Diagnostic, Johnson, Desai, Martinez, and Zimmelman are actively engaged in trade and commerce in the State of Florida.

174.    GEICO and its Insureds are "consumers" as defined by Fla. Stat. 501.203.

175.    Advanced Diagnostic, Johnson, Desai, Martinez, and Zimmelman engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

176.    The bills and supporting documents submitted or caused to be submitted by Advanced Diagnostic, Johnson, Desai, Martinez, and Zimmelman to GEICO were fraudulent in that they misrepresented: (i) Advanced Diagnostic's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were medically necessary; and (iii) that the Fraudulent Services actually were legitimately performed in the first instance.

177.    Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous.  Additionally, the conduct of Advanced Diagnostic, Johnson, Desai, Martinez, and Zimmelman has been materially injurious to GEICO and its Insureds.

178.    The conduct of Advanced Diagnostic Johnson, Desai, Martinez, and Zimmelman was the actual and proximate cause of the damages sustained by GEICO.

179.    Advanced Diagnostic Johnson, Desai, Martinez, and Zimmelman's unfair and deceptive acts have caused GEICO to sustain damages of at least $21,200,000.00.

180.    By reason of Advanced Diagnostic Johnson, Desai, Martinez, and Zimmelman's conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2).

## FIFTH CAUSE OF ACTION
### Against Johnson
### (Under Fla. Stat. 772.103(3))

181.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-149 above.

182.    Advanced Diagnostic is an ongoing "enterprise," as that term is defined in Fla. Stat. § 772.102(3), that engages in activities that constitute a pattern of criminal activity.

183.    Johnson knowingly has conducted and/or participated, directly or indirectly, in the conduct of Advanced Diagnostic's affairs through a pattern of criminal activity consisting of repeated acts constituting insurance fraud in violation of Fla. Stat. § 817.234(1)(a), by submitting or causing to be submitted thousands of fraudulent bills to GEICO seeking payment under automobile insurance policies issued by GEICO to Florida Insureds, when the billing contained false and misleading information concerning facts material to the claims for which reimbursement was being sought in that: (i) the Advanced Diagnostic Clinics unlawfully operated in violation of the Clinic Act's medical director and licensing requirements; (ii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants and others, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; and (iii) in many cases, the Fraudulent Services never were legitimately provided in the first instance.

184.    These knowing and intentional acts constitute a pattern of criminal activity, in that said acts constitute insurance fraud in violation of Fla. Stat. § 817.234(1)(a).

185.    Advanced Diagnostic is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other

insurers. These inherently unlawful acts are taken by Advanced Diagnostic in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

186.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $21,200,000.00 pursuant to the fraudulent bills submitted through the Advanced Diagnostic enterprise.

187.    By reason of Johnson's conduct, GEICO is also entitled to recover threefold the actual damages it actually sustained, reasonable attorney's fees, and court costs pursuant to Fla. Stat. § 772.104.

### SIXTH CAUSE OF ACTION
**Against Johnson, Desai, Martinez, and Zimmelman**
**(Under Fla. Stat. 772.103(4))**

188.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-149 above.

189.    Advanced Diagnostic is an ongoing "enterprise," as that term is defined in Fla. Stat. § 772.102(3), that engages in activities that constitute a pattern of criminal activity.

190.    Johnson, Desai, Martinez, and Zimmelman are employed by or associated with the Advanced Diagnostic enterprise.

191.    In furtherance of the fraudulent scheme, Johnson, Desai, Martinez, and Zimmelman submitted or caused to be submitted thousands of fraudulent bills through Advanced Diagnostic to GEICO seeking payment under automobile insurance policies issued by GEICO to Florida Insureds.

192.    When the billing was submitted, Johnson, Desai, Martinez, and Zimmelman knew that the billing contained false and misleading information concerning facts material to the claims

for which reimbursement was being sought in that: (i) the Advanced Diagnostic Clinics unlawfully operated in violation of the Clinic Act's medical director and licensing requirements; (ii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants and others, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; and (iii) in many cases, the Fraudulent Services never were legitimately provided in the first instance.

193.    These knowing and intentional acts constitute a pattern of criminal activity, in that said acts constitute insurance fraud in violation of Fla. Stat. § 817.234(1)(a).

194.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $21,200,000.00 pursuant to the fraudulent bills submitted through the Advanced Diagnostic enterprise.

195.    By reason of Johnson, Desai, Martinez, and Zimmelman's conduct, GEICO is also entitled to recover threefold the actual damages it actually sustained, reasonable attorney's fees, and court costs pursuant to Fla. Stat. § 772.104.

### SEVENTH CAUSE OF ACTION
**Against Advanced Diagnostic, Johnson, Desai, Martinez, and Zimmelman**
**(Common Law Fraud)**

196.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-149 above.

197.    Advanced Diagnostic, Johnson, Desai, Martinez, and Zimmelman intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of submitting, or causing to be submitted, thousands of fraudulent charges through Advanced Diagnostic for the Fraudulent Services.

341.   The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that that the Advanced Diagnostic Clinics were in compliance with the Clinic Act and eligible to collect PIP Benefits in the first instance, when in fact the Advanced Diagnostic Clinics were never in compliance with the Clinic Act, and never were eligible to collect PIP Benefits, because they operated without legitimate medical directors; and (ii) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not medically necessary; and (iii) in many claims, the representation that the Fraudulent Services actually were performed, when in many cases they were not actually legitimately performed.

198.   Advanced Diagnostic, Johnson, Desai, Martinez, and Zimmelman intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Advanced Diagnostic that were not reimbursable.

199.   GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $21,200,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted by Advanced Diagnostic, Johnson, Desai, Martinez, and Zimmelman through Advanced Diagnostic.

200.   Advanced Diagnostic, Johnson, Desai, Martinez, and Zimmelman' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

201.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### EIGHTH CAUSE OF ACTION
**Against Advanced Diagnostic, Johnson, Desai, Martinez, and Zimmelman**
**(Unjust Enrichment)**

202.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-149, above.

203.    As set forth above, Advanced Diagnostic, Johnson, Desai, Martinez, and Zimmelman have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

204.    When GEICO paid the bills and charges submitted or caused to be submitted by Advanced Diagnostic, Johnson, Desai, Martinez, and Zimmelman through Advanced Diagnostic, it reasonably believed that it was legally obligated to make such payments based on Advanced Diagnostic, Johnson, Desai, Martinez, and Zimmelman' improper, unlawful, and/or unjust acts.

205.    Advanced Diagnostic, Johnson, Desai, Martinez, and Zimmelman have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Advanced Diagnostic, Johnson, Desai, Martinez, and Zimmelman voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

206.    Advanced Diagnostic, Johnson, Desai, Martinez, and Zimmelman' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

207.    By reason of the above, Advanced Diagnostic Johnson, Desai, Martinez, and Zimmelman have been unjustly enriched in an amount to be determined at trial, but in no event less than $21,200,000.00.

## NINTH CAUSE OF ACTION
### Against Desai
### (Violation of RICO, 18 U.S.C. § 1962(c))

208.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-149, above.

209.    CareFirst is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

210.    Desai knowingly has conducted and/or participated, directly or indirectly, in the conduct of CareFirst's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over three years seeking payments that CareFirst was not eligible to receive under the No-Fault Law because: (i) CareFirst unlawfully operated in violation of the Clinic Act's medical director and licensing requirements; (ii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants and others, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; and (iii) in many cases, the Fraudulent Services never were legitimately provided in the first instance.

211.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2".

212.    CareFirst's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Desai operated CareFirst, inasmuch as CareFirst was not engaged in a

legitimate healthcare practice, and acts of mail fraud therefore were essential in order for CareFirst to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that CareFirst and Desai continue to attempt collection on the fraudulent billing submitted through CareFirst to the present day.

213.    CareFirst is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by CareFirst in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

214.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,900,000.00 pursuant to the fraudulent bills submitted through the CareFirst enterprise.

215.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### TENTH CAUSE OF ACTION
**Against CareFirst and Desai**
**(Under Fla. Stat. 501.201 et. seq.)**

216.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-149, above.

217.    CareFirst and Desai are actively engaged in trade and commerce in the State of Florida.

218.    GEICO and its Insureds are "consumers" as defined by Fla. Stat. 501.203.

219.     CareFirst and Desai engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

220.     The bills and supporting documents submitted or caused to be submitted by CareFirst and Desai to GEICO were fraudulent in that they misrepresented: (i) CareFirst's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were medically necessary; and (iii) that the Fraudulent Services actually were legitimately performed in the first instance.

221.     Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous. Additionally, the conduct of CareFirst and Desai has been materially injurious to GEICO and its Insureds.

222.     The conduct of CareFirst and Desai was the actual and proximate cause of the damages sustained by GEICO.

223.     CareFirst and Desai's unfair and deceptive acts have caused GEICO to sustain damages of at least $1,900,000.00.

224.     By reason of CareFirst and Desai's conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2).

**<u>ELEVENTH CAUSE OF ACTION</u>**
**Against Desai**
**(Under Fla. Stat. 772.103 <u>et</u>. <u>seq.</u>)**

225.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-149, above.

226.    In furtherance of the fraudulent scheme, Desai submitted or caused to be submitted thousands of fraudulent charges through the CareFirst enterprise to GEICO seeking payment pursuant under automobile insurance policies issued by GEICO to Florida Insureds.

227.    When the billing was submitted, Desai knew that the billing contained false and misleading information concerning facts material to the claims for which reimbursement was being sought in that: (i) CareFirst unlawfully operated in violation of the Clinic Act's medical director and licensing requirements; (ii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants and others, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; and (iii) in many cases, the Fraudulent Services never were legitimately provided in the first instance.

228.    These knowing and intentional acts constitute a pattern of criminal activity, in that said acts constitute insurance fraud in violation of Fla. Stat. § 817.234(1)(a).

229.    This pattern of criminal activity resulted in Desai receiving more than $1,900,000.00 in PIP Benefits to which he was not entitled.

230.    Desai's pattern of criminal activity has caused GEICO to sustain damages of at least $1,900,000.00.

231.    By reason of Desai's conduct, GEICO is also entitled to recover threefold the actual damages it actually sustained, reasonable attorney's fees, and court costs pursuant to Fla. Stat. § 772.104.

## TWELFTH CAUSE OF ACTION
### Against CareFirst and Desai
### (Common Law Fraud)

232.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-149, above.

233.     CareFirst and Desai intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of submitting, or causing to be submitted, thousands of fraudulent charges through CareFirst for the Fraudulent Services.

341.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that CareFirst was in compliance with the Clinic Act and eligible to collect PIP Benefits in the first instance, when in fact CareFirst was never in compliance with the Clinic Act, and never was eligible to collect PIP Benefits, because it operated without a clinic license or medical director and did not legitimately qualify for the "wholly owned" exemption to the Clinic Act; and (ii) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not medically necessary; and (iii) in many claims, the representation that the Fraudulent Services actually were performed, when in many cases they were not actually legitimately performed.

234.     CareFirst and Desai intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through CareFirst that were not reimbursable.

235.     GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by

reason of the above-described conduct in that it has paid at least $1,900,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted by CareFirst and Desai.

236.    CareFirst and Desai's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

237.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## THIRTEENTH CAUSE OF ACTION
### Against CareFirst and Desai
### (Unjust Enrichment)

238.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-149, above.

239.    As set forth above, CareFirst and Desai have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

240.    When GEICO paid the bills and charges submitted or caused to be submitted by CareFirst and Desai, it reasonably believed that it was legally obligated to make such payments based on CareFirst and Desai's improper, unlawful, and/or unjust acts.

241.    CareFirst and Desai have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that CareFirst and Desai voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

242.    CareFirst and Desai's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

243.    By reason of the above, CareFirst and Desai have been unjustly enriched in an amount to be determined at trial, but in no event less than $1,900,000.00.

## JURY DEMAND

244.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. demand that a Judgment be entered in their favor:

A.     On the First Cause of Action against Advanced Diagnostic and CareFirst, for a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Advanced Diagnostic and CareFirst have no right to receive payment for any pending bills submitted to GEICO;

B.     On the Second Cause of Action against Johnson and Desai, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $21,200,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.     On the Third Cause of Action against Johnson, Desai, Martinez, and Zimmelman, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $21,200,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.     On the Fourth Cause of Action against Advanced Diagnostic, Johnson, Desai, Martinez, and Zimmelman, compensatory damages in an amount to be determined at trial but in excess of $21,200,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2);

E.      On the Fifth Cause of Action against Johnson, compensatory damages in an amount to be determined at trial but in excess of $21,200,000.00, together with treble damages, reasonable attorney's fees, and court costs pursuant to Fla. Stat. 772.104;

F.      On the Sixth Cause of Action against Advanced Diagnostic, Johnson, Desai, Martinez, and Zimmelman, compensatory damages in an amount to be determined at trial but in excess of $21,200,000.00, together with treble damages, reasonable attorney's fees, and court costs pursuant to Fla. Stat. 772.104;

G.      On the Seventh Cause of Action against Advanced Diagnostic, Johnson, Desai, Martinez, and Zimmelman, compensatory damages in an amount to be determined at trial but in excess of $21,200,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

H.      On the Eighth Cause of Action against Advanced Diagnostic, Johnson, Desai, Martinez, and Zimmelman, more than $21,200,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

I.      On the Ninth Cause of Action against Desai, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,900,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

J.      On the Tenth Cause of Action against CareFirst and Desai, compensatory damages in an amount to be determined at trial but in excess of $1,900,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2);

K.      On the Eleventh Cause of Action against CareFirst and Desai, compensatory damages in an amount to be determined at trial but in excess of $1,900,000.00, together with treble damages, reasonable attorney's fees, and court costs pursuant to Fla. Stat. 772.104;

L.      On the Twelfth Cause of Action against CareFirst and Desai, compensatory damages in an amount to be determined at trial but in excess of $1,900,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

M.      On the Thirteenth Cause of Action against CareFirst and Desai, more than $1,900,000.00  in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

Dated: November 5, 2020

*/s/ John P. Marino*
John P. Marino (FBN 814539), Trial Counsel
Lindsey R. Trowell (FBN 678783)
Kristen Wenger (FBN 92136)
SMITH, GAMBRELL & RUSSELL, LLP
50 North Laura Street, Suite 2600
Jacksonville, Florida 32202
Phone:  (904) 598-6100
Facsimile:  (904) 598-6204
ltrowell@sgrlaw.com
jmarino@sgrlaw.com
kwenger@sgrlaw.com

*Attorneys for Plaintiffs*